**UNITED STATES of America, Plaintiff,**

v.

**Timothy James McVEIGH and Terry Lynn Nichols, Defendants.**

**Criminal Action No. 96–CR–68–M.**

United States District Court,
D. Colorado.

Aug. 14, 1996.

See also 931 F.Supp. 756.

Patrick M. Ryan, U.S. Attorney for Western District of Oklahoma, Oklahoma City, OK, Joseph Hartzler, Special Assistant U.S. Attorney, Assigned from S.D. Illinois, Denver, CO, for plaintiff U.S.

Stephen Jones, Richard H. Burr, III, Robert Nigh, Jr., Jones, Wyatt & Roberts, Enid, OK, Jeralyn E. Merritt, Denver, CO, for defendant McVeigh.

Michael Tigar, Ronald G. Woods, N. Reid Neureiter, Denver, CO, for defendant Nichols.

MEMORANDUM OPINION AND ORDER ON MOTIONS TO SUPPRESS EVIDENCE AND REGARDING ADMISSIBILITY OF STATEMENTS OF TERRY LYNN NICHOLS

MATSCH, Chief Judge.

This Memorandum Opinion and Order addresses motions to suppress evidence filed by defendant Terry Nichols as docket entry no. 1453 and by defendant Timothy McVeigh as docket entry no. 1457. Redacted versions of these same motions appear in the public record under docket entries 1452 and 1455. Also addressed is a motion in limine regarding statements of Terry Nichols filed by the United States as docket entry no. 1003.

The complete motions remain sealed because they include references and attachments describing facts which are not now and may never be in evidence, and the court considers them to be properly sealed under the criteria set forth in the Memorandum Opinion and Order on Media Motions, entered January 24, 1996. If that material were now made public, it would likely generate pre-trial publicity prejudicial to the interests of all parties in this criminal proceeding. The bases for the rulings are fully disclosed in this memorandum opinion.

After initial briefing, the court held a hearing on June 18, 1996. At that hearing, counsel for Timothy McVeigh made offers of proof addressing his motion challenging the following search warrants: (1) a search warrant issued by Magistrate Judge Ronald Howland on April 21, 1995, at 3:55 p.m. for the search of Timothy McVeigh's property in custody at the Noble County Jail in Perry, Oklahoma; (2) a search warrant issued by Chief Judge David Russell on April 21, 1995, at 3:10 p.m. for the search of a Mercury Marquis automobile that had been driven by Timothy McVeigh; (3) a search warrant issued by Magistrate Judge Howland on April 21, 1995, at 5:55 p.m. for taking hair samples from the person of Timothy McVeigh; and (4) a search warrant issued by Magistrate Judge Morton Sitver on April 23, 1995, at 5:23 p.m. for a search of box number 206 at the Mail Room, in Kingman, Arizona. Mr. McVeigh challenged those search warrants on the ground that the affidavits filed in support of them, signed by FBI agent Henry Gibbons, contained false and misleading information and that under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the court should find that the FBI provided such information to the issuing judicial officers knowingly or with reckless disregard for the truth of the information and that the challenged information was necessary to finding probable cause for issuing each of these warrants. This court ruled at the June 18, 1996, hearing that the defendant's proffer of facts was not sufficient for an evidentiary hearing under the *Franks v. Delaware* case. The court also made an oral ruling that the information in an additional proffer, challenging the search warrants on the ground that Chief Judge Russell and Magistrate Judge Howland were not capable of giving neutral and objective consideration to the affidavits, because of their personal experiences, was insufficient to support the contention, and that no evidentiary hearing was required. Those oral rulings are now incorporated into this memorandum opinion and order by this reference.

The other motions to suppress were the subject of a four-day evidentiary hearing and post-hearing submission of proposed findings of fact and conclusions of law. Upon a review of all of this material, the court now makes its findings and conclusions in the form of this memorandum opinion. Because the rulings on the legal issues raised are, in large part, driven by the facts, some of which are in dispute because of contradictory evidence, the court first sets forth the following findings as the facts which are relevant and material to the issues presented by the record.

At 9:02 a.m. on Wednesday, April 19, 1995, an explosion destroyed the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, killing 168 people, injuring hundreds more and capturing the attention of the entire nation. The Federal Bureau of Investigation and other federal law enforcement agencies immediately began a massive investigation even as rescue efforts were being organized. News gathering organizations began comprehensive coverage with radio and television reporters on the scene in Okla-

homa City and everywhere else where events thought to be related were occurring.

The President and the Attorney General of the United States made public statements committing all available investigative resources to determine what had happened and who was responsible, with pledges to seek the death penalty for the perpetrators.

At 10:20 a.m. on Highway I–35 about 70 miles north of Oklahoma City, State Trooper Charles Hanger stopped a 1977 yellow Mercury Marquis automobile because the vehicle was not displaying a license plate as required by Oklahoma statute. The driver of that automobile gave his name as Timothy McVeigh, showed a driver's license, gave his address as 3616 North Van Dyke Road, Decker, Michigan, and gave the name of James Nichols of Decker, Michigan as a reference. Mr. McVeigh had a loaded handgun and a knife. Trooper Hanger arrested Timothy McVeigh for misdemeanor offenses and took him to the Noble County Jail in Perry, Oklahoma. Mr. McVeigh's clothing and personal effects were placed in a storage room at the jail pursuant to the general policy of Sheriff Jerry R. Cook.

At some time on April 19, investigators going through the rubble at the explosion site found an axle from which they obtained a vehicle identification number indicating that it was on a Ryder truck which they traced to Elliot's Body Shop in Junction City, Kansas. People interviewed at that business advised that the truck had been rented to a man who presented a South Dakota driver's license with the name Robert Kling. Through interviews and records checks FBI agents learned that Timothy McVeigh had registered at the Dreamland Motel in Junction City, on April 14, using the Decker, Michigan address.

At approximately 11:30 p.m. (E.D.T.) on Thursday, April 20, FBI agents contacted Detective David Hall of the Sanilac County Sheriff's Department in Michigan seeking information about the Decker address given by Timothy McVeigh. Detective Hall reported that the address was a farm belonging to James Nichols and that the sheriff's office had conducted an earlier investigation of that farm because of reports from Kelly Langenburg, the ex-wife of James Nichols. Detective Hall said that he had been told that Timothy McVeigh had stayed with James and his brother Terry Nichols at the Decker farm. The FBI interviewed Kelly Langenburg in Michigan at approximately 9:00 a.m. (E.D.T.) on Friday, April 21. During the afternoon of that day, FBI agents surrounded the James Nichols farm and conducted an extensive search of it pursuant to a warrant. News of that search was telecast by CNN. The FBI also learned that Kelly Langenburg's sister, Lana Padilla, had been married to Terry Nichols. Agents found her in Las Vegas, Nevada, and questioned her as well as Josh Nichols, the 12–year old son of Terry Nichols and Lana Padilla.

On April 21, the FBI filed a complaint in the United States District Court for the Western District of Oklahoma, charging Timothy McVeigh with participation in bombing the Murrah Building. The court issued a warrant for his arrest. At about 10:00 a.m. federal agents contacted Sheriff Cook in Perry, Oklahoma, to inquire about Mr. McVeigh's status. Upon learning that he was still in custody, agents went to the Noble County Jail arriving there at about noon. The FBI agents formally placed Timothy McVeigh under federal arrest at about 4:30 p.m. and removed him from the Noble County Jail at around 6:00 p.m. Sheriff Cook's secretary, Deborah Thompson, typed an inventory of Mr. McVeigh's property and reviewed it with FBI fingerprint examiner Louis Hupp, who had come to the Noble County Jail to fingerprint Mr. McVeigh and obtain his property. Mr. Hupp added some handwritten items on the typed inventory and signed a receipt for the property at about 4:30 p.m. after fingerprinting Mr. McVeigh. After Timothy McVeigh was taken from the building, Mr. Hupp took the prisoner's clothes and personal property to the Prairie County Airport, got on an airplane and went to Washington D.C., where he delivered Mr. McVeigh's belongings to the FBI laboratory for testing.

Earlier that afternoon, at about 3:55 p.m., United States Magistrate Judge Howland, in Oklahoma City, issued a warrant for the search and seizure of Mr. McVeigh's clothing and personal property. The warrant was not

given to Sheriff Cook, and it expired by its terms on April 28, 1995. The search warrant was returned to the court in Oklahoma City marked "returned not executed" on May 4, 1995.

The overall FBI investigation was being coordinated at the Strategic Information Operation Center ("SIOC") in FBI headquarters in Washington, D.C. Information coming in from agents working throughout the country was routed through the SIOC where FBI General Counsel Howard Shapiro was working with Merrick Garland, principal assistant to Deputy Attorney General Jamie Gorelick. Other command posts were operating at Oklahoma City, Kansas City, Fort Riley, Las Vegas and Detroit. Working with the FBI agents at the command post in Oklahoma City, were Donna Bucella, Deputy Director of the Executive Office for United States Attorneys, Jim Reynolds, head of the Anti-Terrorism Division of the Department of Justice, and assistant U.S. Attorneys for the Western District of Oklahoma, Arlene Joplin, Jerome Holmes and Vicki Behenna.

Chief Judge Russell and Magistrate Judge Howland of the United States District Court for the Western District of Oklahoma came to the Oklahoma City command post during the afternoon of April 21, 1995, to consider applications for such warrants as may be requested. There were open lines of communication connecting all of these command posts and the SIOC in Washington.

Almost all of the investigative activity was being reported in telecasts and radio broadcasts as it was happening. FBI agents in the field were well aware of the coverage and the media's interest in keeping abreast of late-breaking developments. For example, agent William Chornyak at the Kansas City command post first learned of the search of the James Nichols' farm in Michigan through the coverage by CNN.

Terry Nichols lived with his wife Marife and 20-month old daughter, Nichole, at 109 South Second Street in Herington, Kansas. The information associating him and his brother with Timothy McVeigh made Terry Nichols a subject of interest to the FBI, and in the early afternoon of April 21, an FBI SWAT team was dispatched to go to Herington to prepare for a search of Terry Nichols' residence. Other teams of FBI agents went to Herington throughout that Friday afternoon. During the morning of April 21, FBI agent Stephen Smith contacted Dale Kuhn, the Herington Public Safety Director, and Barry Thacker, Assistant Director of Public Safety, at the Herington Department of Public Safety Building ("police station") to get information about Mr. Nichols. They gave agent Smith Mr. Nichols' home address and said that he had been at the police station during the previous week to register his vehicle. Agent Smith and agent Foley drove to the Nichols' residence to begin surveillance. Supervisory agent Thomas Price and a nine-member surveillance team had also been sent to cover the Nichols' home. Herington is a small community of about 2,600 persons and all of these FBI vehicles were presumably noticeable to the residents.

After hearing Timothy McVeigh's name mentioned as a suspect in a newscast about the Oklahoma City bombing investigation, and hearing some mention of his own name, Terry Nichols got into his blue pickup truck with his wife and daughter and drove to Surplus City, a local hardware store, where he stopped, stepped out of his truck briefly, got back into it, turned around, and went to the police station, arriving at 2:50 p.m. Mr. Nichols, with his wife and daughter, went in the front door, where they were met by Barry Thacker. Terry Nichols identified himself and said that he wanted to talk with someone to find out why his name was being broadcast in connection with the bombing investigation. Dale Kuhn then entered the room and joined in the conversation. Both Kuhn and Thacker said that they did not know the answer to Terry Nichols' questions. They asked whether Mr. Nichols was carrying any weapons and then requested a visual search. Terry Nichols readily complied by taking off his jacket and lifting his shirt. Chief Kuhn said he would try to get someone to answer Mr. Nichols' questions. The family was left alone in the officers' room at the police station while Chief Kuhn and Assistant Chief Thacker went to contact the FBI.

FBI agents Smith and Price had seen Terry Nichols go into the police station. They

reported that information to FBI agent Chornyak in Kansas City who then called Chief Kuhn at the police station asking whether there was any kind of crisis situation or any danger. That call was made because of a concern that Mr. Nichols might be wired with explosives. Agent Price was instructed to try to interview Mr. Nichols and to keep him under surveillance if he left the police station. Agent Chornyak promptly reported to agent Rich Baker in the Oklahoma City command post that Terry Nichols had "turned himself in."

Four FBI agents, Smith, Price, Foley and Gillespie, entered the police station at about 3:10 p.m. and identified themselves to Terry Nichols and Marife Nichols. Mr. Nichols immediately asked the agents why his name was being broadcast. Agent Foley said he was not sure, but the FBI wanted to ask him questions. Agent Smith referred to past association with Tim McVeigh as the reason for the agents' interest in questioning Mr. Nichols. Terry Nichols said that he had his own questions for the agents.

Following another search of Terry Nichols, Marife and their child for weapons, Terry Nichols voluntarily went with agents Smith and Foley into the basement of the police station where Chief Kuhn arranged chairs, showed them the restrooms and offered to provide coffee or anything else they needed. The basement was used frequently as a classroom and meeting room for the Herington police and fire departments. The basement meeting room is the largest room in the police station, other than the garage. The lighting quality was good and the room had adequate ventilation and temperature controls. There are no windows.

A few minutes after the discussion began, agent Foley said that he intended to advise Terry Nichols of his rights. Agent Foley handed Mr. Nichols FBI form FD 395, entitled "Interrogation—Advice of Rights," and asked Mr. Nichols to read it aloud. That form sets out a full advisement of rights as required for a custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Agent Foley and Terry Nichols discussed the contents of the form for about 17 min-

utes. Mr. Nichols said that he would not sign this form because the word "Interrogation" in the title reminded him of the Nazis. Agent Foley responded that Mr. Nichols need not sign the form as long as he understood his rights. When asked directly whether he understood his rights, Terry Nichols responded that he did and that he wanted to talk with the agents.

During the discussion about the *Miranda* form, agent Foley told Mr. Nichols that he was free to go, that the agents had no cause to hold him, and that he could walk out the door if he wanted to do so. Mr. Nichols told the agents that he had come to the police station because he did not want "another Waco."

Terry Nichols' refusal to sign the advice of rights form was relayed to Howard Shapiro, who directed agent Chornyak to instruct the agents to try to get Mr. Nichols to talk with them and to remind them that he was not in their custody. Mr. Shapiro told agent Chornyak that a material witness arrest warrant for Mr. Nichols was going to be obtained in Oklahoma City, and that if Mr. Nichols decided to leave the station, the agents should maintain close surveillance until they could arrest him on that warrant.

At approximately 4:12 p.m., FBI agents Scott Crabtree and Dan Jablonski entered the interview room. Agent Smith, who had been assigned to take notes, read his notes aloud for them, asking Terry Nichols to stop him at any time to tell him of any errors, inconsistencies or additions. Mr. Nichols added certain things to clarify his statements.

During this review of his notes, agent Smith told Crabtree and Jablonski that Mr. Nichols had received *Miranda* warnings and that he had said that, while he understood his rights and wanted to talk, he refused to sign the "Advice of Rights" form. Terry Nichols said nothing to disagree with agent Smith's recital. Agent Jablonski addressed Mr. Nichols telling him again that he was free to go and asking again if he understood his rights. Mr. Nichols said that he did understand and wanted to continue to talk with the agents.

Mr. Nichols asked if he could get a copy of agent Smith's notes, and agent Smith responded affirmatively. There was no specific discussion about when and where the copy of the notes would be provided to Terry Nichols.

Agents Foley and Jablonski left the meeting room at 4:53 p.m., returning at times during breaks in the interview conducted by agents Smith and Crabtree during the remaining afternoon and evening. During each break, Terry Nichols was free to use the restroom and partake of food and drink. There was no display of weapons in the room, and Mr. Nichols never asked to consult with an attorney or whether he was under arrest. Mr. Nichols never complained about the duration, site, scope, or substance of the agents' questioning, and he never asked to stop the questioning or refused to continue talking.

At 8:52 p.m., a few minutes after a break in the interview, Marife Nichols, with Nichole, entered the basement meeting room with agents Jablonski, Foley and Thomeczek. Mr. and Mrs. Nichols spoke privately for about five minutes in the basement hallway a few feet away from the agents. Agent Jablonski heard Terry Nichols tell his wife that he did not know when he would be leaving, saying "I have to finish answering questions." Terry Nichols then handed Marife a telephone credit card which agent Jablonski copied when she and he went back upstairs. The card was then returned to Mrs. Nichols.

After another break, from 10:21–10:50 p.m., during which no agents spoke with Terry Nichols, agents Crabtree and Smith asked whether Mr. Nichols would like to hear a taped message from his ex-wife Lana and son Josh; Mr. Nichols said he did, and the agents played it for him. The FBI had made that recording earlier that day in Las Vegas. Josh asked his father to cooperate with the FBI.

At 12:10 a.m. on April 22, agents Smith and Crabtree left the interview room and were replaced by agents Foley and Jablonski. Agent Jablonski became aggressive in his questioning, raising his voice and accusing Terry Nichols of lying to the agents. Agent Jablonski then arrested Terry Nichols

on a material witness warrant from the U.S. District Court in Oklahoma City, and the interview ended.

While the FBI agents in Herington were securing the Nichols' residence and truck, and questioning both Mr. and Mr. Nichols, Henry Gibbons, an FBI agent and lawyer, working with the attorneys in the Oklahoma City command post, obtained that arrest warrant for Terry Nichols as a material witness. It was one of six search and arrest warrants signed in the Oklahoma City command post on Friday, April 21, 1995. Mr. Gibbons was the affiant on all the warrant applications, using information received from FBI agents in the field and other command posts during what he said was the busiest day of his life.

Mr. Gibbons was first directed to draft an affidavit for a warrant to arrest Terry Nichols as a material witness at approximately 4:00 p.m. Justice Department lawyer Jim Reynolds in Oklahoma City prepared the format for the warrant, using, as a model, a material witness warrant that was issued on the previous day for the arrest of Abraham Abdallah Ahmed as a witness. Mr. Ahmed had left Oklahoma City on an American Airlines flight shortly after the explosion on April 19 and was detained in England. The face of the Ahmed warrant recited that he "has attempted to leave the jurisdiction of the United States, and it may become impracticable to secure his presence by subpoena." (Ex. 71). The first form of warrant for the arrest of Terry Nichols as a witness presented to and signed by Chief Judge Russell bore the same recital as the Ahmed warrant—that the witness attempted to leave the jurisdiction of the United States. It also mistakenly bore the caption "United States v. Terry Lynn Nichols," and was entitled "Warrant for Arrest" without indicating that it was for the arrest of a witness. (Ex. 26). The Ahmed warrant had also incorrectly identified Ahmed as the named defendant.

When government counsel discovered the mistake in the caption of the Terry Nichols warrant and informed Judge Russell about it, he signed a second form of warrant, with the correct caption and suggested shredding the

one signed earlier if it had not been sent out. A copy of the first signed warrant for Mr. Nichols had already been transmitted by facsimile to FBI agent Chornyak in Kansas City at 4:45 p.m. (Ex. 26).

The second form of warrant to arrest Terry Nichols as a material witness did not include the recital about an attempt to leave the jurisdiction of the United States. It simply stated the conclusion that, if left to his own devices, it would be impracticable to secure his presence at such time as the case is called before the grand jury. (Ex. 22). The same affidavit of Henry Gibbons was used in support of both of the Nichols warrants signed by Judge Russell. The affidavit itself said nothing about any attempt by Terry Nichols to leave the jurisdiction of the United States. It did allege that a person closely associated with Terry Nichols advised that Mr. Nichols had publicly renounced his citizenship.

Neither Mr. Gibbons nor the government lawyers told Judge Russell that Terry Nichols was at the Herington police station when they presented the application for a warrant for his arrest. The Assistant Director of the FBI's Intelligence Division in Washington, D.C., "Bear" Bryant, was informed immediately when the first warrant was signed, and he advised agent Chornyak who relayed that information to agent Price in Herington at about 4:30 p.m. Agent Price told agent Gillespie that they soon would receive a copy of the arrest warrant. Agent Chornyak received a facsimile copy at 4:45 p.m. He faxed copies to agent Price at the Herington police station and to agent Joe Bross at the Fort Riley command post shortly after 5:00 p.m.

Randall Rathbun, then United States Attorney for the District of Kansas, went to the Fort Riley command post on the instructions of Deputy Attorney General Gorelick to prepare an application for a warrant to search the Nichols' residence in Herington. Mr. Rathbun was not told about the material witness arrest warrant for Mr. Nichols in a briefing given to him by agent Bross at Fort Riley. Mr. Rathbun went from Fort Riley to the Herington police station, arriving there at approximately 8:45 p.m.

Agents Smith, Crabtree, Foley and Jablonski were not told about the arrest warrant when it arrived because of a command decision to keep the interview going, recognizing that upon his arrest Terry Nichols might stop talking.

Terry Nichols first learned of the warrant for his arrest when agent Jablonski made the formal arrest after midnight. The record shows that agent Jablonski read Mr. Nichols his *Miranda* rights at 12:25 a.m. on April 22. Mr. Nichols refused to sign the "Advice of Rights" form, and the interview ended. After his arrest, Terry Nichols was taken to a county jail in Abilene, Kansas, and held there before being taken to the federal courthouse in Wichita for his initial appearance later in the day.

There were activities outside the Herington police station that were not known to Terry Nichols during the interview. After seeing telecasts suggesting that Terry Nichols was in custody in Kansas, the Kansas Federal Public Defender, David J. Phillips, on his own initiative, began making inquiries to locate Mr. Nichols. He called the Herington police station at 9:38 p.m. offering to represent Terry Nichols if he was there. Someone took the message without comment. Upon hearing of this call, agent Price told Chief Kuhn that the lawyer's name and phone number would be given to Terry Nichols if he asked for a lawyer. No one told Mr. Nichols about that offer for legal assistance, and he did not request counsel while he was at the Herington police station or at the jail in Abilene.

The SWAT team from Kansas City arrived at Fort Riley about 40 minutes after Terry Nichols' appearance at the Herington Police Station. Because of that development they left their SWAT team weapons and gear at Fort Riley and proceeded to Herington in their normal role as investigators.

Acting on the possibility that Terry Nichols might have an explosive device in his truck or his home, the police and the FBI investigators evacuated all occupants of the buildings from a one-block area north of the police station where the truck was parked and blocked off the streets around Nichols'

house. Occupants of houses in the immediate area of the house were asked to leave.

There was an intense interest in searching the truck and residence. Accordingly, the agents asked Terry Nichols for his consent to search early in the interview. At 4:34 p.m. Terry Nichols signed a standard FBI consent form witnessed by agents Jablonski and Foley, after adding the notation "without prejudice U.C.C. 1-207." (Ex. B-1). He asked whether he or his wife could be present during the search, and the agents gave an affirmative response. Later, during one of the breaks in questioning, agent Foley said that he was concerned for the safety of the searching agents and asked Mr. Nichols to make a sketch of his home and show where ammunition and firearms were located. Terry Nichols drew a sketch of his house, clearly marking the locations of guns and ammunition shortly before 9:00 p.m. (Ex. 33).

On Saturday afternoon, April 22, agents Smith and Crabtree transported Terry Nichols from the jail in Abilene to Wichita, for his initial appearance in court. Agent Crabtree told Mr. Nichols that they were going to go to Wichita where an attorney would be appointed to represent him, and he would appear before the court. Ten or fifteen minutes into the ride Terry Nichols asked the agents whether his residence had been searched. Agent Crabtree responded that the agents had not yet searched the home because they were proceeding very carefully due to safety concerns, not knowing what dangers might be there. Terry Nichols was reassuring, saying that the only items requiring caution were loaded weapons, and he again described their locations. He also advised that there were intrusion alarms, noting that the one monitoring the back door was not functioning. There was some additional discussion during the trip. Upon arrival at the federal courthouse in Wichita, deputy U.S. Marshals came to the FBI automobile and took Mr. Nichols into the building. Agents Smith and Crabtree locked the vehicle and went to the Marshal's office where they asked one of the deputies to inform Terry Nichols that the agents were available if he wanted further conversation with them.

While undergoing routine processing with Deputy Marshal Daryl Ingermanson, Mr. Nichols said that he "wished to speak with the agents before he went to court." Deputy Ingermanson responded that he would be happy to bring the agents back to the holding cell. A little later, the agents came to the cell and had additional conversation with Mr. Nichols which was interrupted when court appointed counsel arrived.

In response to deputy Ingermanson's inquiry, Terry Nichols gave the names "Joe Rivers" and "Ted Parker", as names he had used and deputy Ingermanson noted them as aliases on the standard personal history form.

At his initial appearance before U.S. District Judge Monti Belot at 4:55 p.m. on April 22, Mr. Nichols was represented by the Kansas Federal Public Defender, David Phillips and his assistant Steve Gradert. Mr. Nichols expressed some confusion to the judge, saying that the warrant reported that he had attempted to leave the jurisdiction of the United States, whereas he went down to the police station voluntarily. The hearing was continued on April 26, with the same lawyers appearing for the detained witness. Mr. Phillips told the court that the affidavit for the warrant was not contested but that Mr. Nichols did challe.. the finding that it may be impracticable . secure his presence by a subpoena, the sta.utory basis for the arrest of a material witness. Accordingly, counsel moved to quash the warrant arguing that Terry Nichols had been cooperative, voluntarily meeting with the authorities and consenting to a search of his house and vehicle. Judge Belot denied the motion, finding probable cause for the material witness arrest and ordered that Terry Nichols be detained. (Ex. 35).

Agent James Reightler went to Herington on Friday, April 21, as a member of the original SWAT team from Kansas City by way of Junction City. He first went to the Herington police station, at approximately 5:30 p.m., where he was instructed to secure Mr. Nichols' home. At least eight to ten local police and FBI agents were assigned to assist in that task. The FBI supervisor said that although the owners of the property had

consented to a search, no search was going to be undertaken that night because of the possibility that there may be explosives on the premises.

Intermittent surveillance of the Nichols' home began at approximately 2:40 p.m. on the afternoon of April 21. The FBI surveillance log indicates that the house was under continuous surveillance by 3:20 p.m. At 4:20 p.m., agents Lindsey, Barger and Maxwell were in the process of putting police security tape around the property.

When agents Reightler and Marlin Ritzman arrived at the Nichols' home at about 6:00 p.m. they saw that agents had control of the area, and they were told that no one had entered or left the house for at least three hours. There were many news gatherers in the immediate vicinity and a crowd of onlookers had collected.

Around 6:00 to 6:30 p.m., agent Reightler walked along the perimeter of the property going from the front to the rear of the house to contact the other agents and to familiarize himself with the property. The garage is within fifteen feet of the house. There is a short concrete walkway connecting the buildings within a wire perimeter fence. The windows of the garage were covered with shades similar to the window shades of the home.

At about 8:30 p.m., agent Reightler again walked along the edge of the Nichols' property, stopped, and, with the aid of a flashlight, looked into the garage through a window with a torn shade. Reightler testified that he looked in the window because he had been told the owners had consented to a search and because he was concerned about possible hazards inside the garage. Agent Reightler saw four white plastic barrels with blue lids, a large number of military-style ammunition cans, some fuel cans, hardware and tools.

Later that evening, in a meeting with other agents, agent Reightler learned that technicians at the Murrah Building site had said that a bomb had likely been contained in white plastic containers with blue lids. Reightler thought that he had seen such containers in the garage, but he had not looked closely enough to determine whether the barrels appeared to be wired or connected to a timing device. Accordingly, he returned to the garage for another look through the window at about 9:30 p.m. He again saw the four white plastic barrels and decided that there was no visible indication that they presented any immediate danger.

Marife Nichols was born on June 11, 1973. Before meeting Terry Nichols she lived in the Philippines in a two-room structure, without a lockable door, shared by seven or eight other people, without an interior toilet or running water. Her father was a police officer as had been her grandfather. Mrs. Nichols learned English as a second language in a school where the last two years of high school courses were taught in English.

Marife married Terry Nichols on November 20, 1990. She came to the United States with him in 1991. They first lived in Henderson, Nevada, and then moved to Michigan where they lived at the James Nichols' farm on and off for about two years. Their daughter Nichole was born in August, 1993. Mrs. Nichols went back to the Philippines in 1994 to attend Southwestern University there, taking college courses taught in English.

In the early afternoon of Friday, April 21, 1995, Terry Nichols heard on the radio that Timothy McVeigh had been arrested on a traffic charge and was a suspect in the Oklahoma City bombing. Mr. Nichols told his wife that he also heard his name mentioned. Mr. and Mrs. Nichols then saw a report about the bombing on television, and Mrs. Nichols heard that Timothy McVeigh was arrested. Terry Nichols gave Marife Nichols $200 before taking her and Nichole with him to the Herington police station. When the Terry Nichols family went into the Herington Police Station and Terry Nichols went to the basement with FBI agents, Marife and Nichole Nichols stayed in the officers' room on the main floor.

Marife Nichols was searched by a female Herington police employee at the direction of the FBI. A Herington police officer also searched the clothing and body of Nichole. The officers' room had no windows or clock. Marife and Nichole Nichols stayed there for the next six hours in the company of William

White, a U.S. Army CID agent, and FBI agent Eugene Thomeczek. FBI agent Sheila Dobson joined them when she arrived at the police station late in the afternoon. Mrs. Nichols talked freely with these agents. None of them told her that she had a right to remain silent; that she could refuse to say anything against her husband; that she had a privilege not to disclose private marital communications or that she had the right to be represented by counsel. Marife Nichols testified that CID agent White encouraged her to tell the truth, "so that it will show that [she has] nothing to hide. That way, Mr. Thomeczek would not repeat his question again and again." (Tr. p. 714).

The agents denied Mrs. Nichols' request to go out to the truck to get diapers for her daughter, telling her that she should not go outside because the media would confront her and that she could not enter the truck because it was going to be checked by a bomb detection squad from the Army. Agent Dobson went to a grocery store, purchased diapers and brought them back to the station.

After several hours of conversation, agents Thomeczek and Dobson asked Marife Nichols for her consent to search the truck and the house, showing her the standard FBI consent form. Mrs. Nichols' first response to the agents was "[y]ou have to get the permission from Terry, because it's his house." The agents replied "We're going to get that and we need yours too." (Tr. p. 722). Mrs. Nichols asked Agent Dobson about the words "right to refuse to consent to such search" on the consent form. When agent Dobson told Mrs. Nichols she could refuse to grant consent, Marife Nichols asked what would happen if she did refuse. Agent Thomeczek responded that they would then have to go to court and get a search warrant which would take time. Mrs. Nichols signed two separate written consents to search: one for the premises at 109 South Second Street, (Ex. W–14A), and one for the truck. (Ex. W–14B). Later, agent Thomeczek wrote on the forms that no consent search was done on April 21.

When Mrs. Nichols asked to see her husband, agents Thomeczek, Jablonski, and Fo-

ley took her and the baby to the basement meeting room. Marife and Terry Nichols had a conversation for a few minutes, standing away from the agents, after which Mr. Nichols gave his wife a telephone charge card. When agent Jablonski asked to make a copy of the credit card she complied without making any protest.

The agents told Mrs. Nichols that she could not return to her residence. After first saying they would go to Junction City, agents Thomeczek and Dobson drove Mrs. Nichols and her daughter to a Best Western Inn in Abilene, Kansas, where CID agents White and Dawn Grey joined them. Marife Nichols and her daughter were given a private room in the motel. They and the agents stayed in Abilene on Saturday, April 22. Mrs. Nichols purchased some clothes, rejecting agent Dobson's offer to pay for them. Mrs. Nichols said that she bought them using money her husband had given her because she preferred not to be a burden on anyone. The FBI agents paid all of her other expenses during that weekend and for the remainder of the time that they had supervision of her.

On Sunday, April 23, the agents took Mrs. Nichols to her home in Herington to get some of her clothing and personal property. Before going to the house, agents Thomeczek and Jablonski asked her to sign another consent to search form for the residence and the truck. Mrs. Nichols told the agents that she would sign the document, even though she said she did not completely understand. In signing, she wrote her first name twice, crossed out one of them, and added the notation, "without prejudice UCC 1–207" above her signature. Seeing that reservation, agent Thomeczek asked Mrs. Nichols to say clearly whether she did or did not consent to the searches. She said that she did consent, explaining that the notation was something she had learned from Terry Nichols and Black's Law Dictionary.

Inside the house, the agents told Mrs. Nichols that she could be there for only about 45 minutes because when the news media learned she was there they would try to interview her on camera and get pictures of her and Nichole. Mrs. Nichols did not

want to be questioned or photographed by reporters and did not object to limiting her time in the house.

Although Mrs. Nichols had to hurry to gather and pack her belongings, she had telephone conversations with her mother in the Philippines and her aunt in California while she was in the house that Sunday afternoon. She had talked with her parents earlier that weekend. Mrs. Nichols went into each room and the basement of the house. When she left with the agents, she had to cover her and Nichole's faces to avoid the taking of pictures by anyone in the large crowd that had gathered outside the house.

As they drove away, agent Thomeczek handed Mrs. Nichols an inventory listing the items that had been taken by the FBI. When she read the list she saw that it did not include $5,000 in currency and a number of valuable coins that she kept in the box springs of the bed. Mrs. Nichols had mentioned the money and coins to agent Thomeczek during their conversation at the police station on Friday.

The $5,000 was extremely important to Mrs. Nichols. She saw it as the only means available to her to purchase a plane ticket and go to her parents in the Philippines. When she saw that it was not in the inventory, she asked agent Thomeczek to go back to the house to get it. Agent Thomeczek refused her request. Back at a motel near Fort Riley, Mrs. Nichols again requested her money, and agent Thomeczek again refused, explaining that the FBI wanted to take the currency to a laboratory to test it for fingerprints of Timothy McVeigh.

Marife Nichols unsuccessfully tried crying to persuade agent Thomeczek to return her money. He gave her a handwritten consent to search containing the following language:

1. I, Marife Torres Nichols, have been asked by Special Agents of the Federal Bureau of Investigation to complete a limited search of my premises at 109 So. 2nd St., Herington, KS.

This search is to locate certain valuables now concealed within those premises.

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. These agents are authorized to remove these valuables as may be related to their investigation.

(Ex. G–1). Mrs. Nichols signed, using the "without prejudice" notation, at a few minutes after 5:00 p.m. on April 23, believing that this would somehow expedite the return of her money.

Later, on Sunday evening at about 9:10 p.m., agent Thomeczek asked Mrs. Nichols to sign another consent to search the garage for a padlock that the FBI thought may be there. She did so, adding the notation, "without prejudice UCC 1–207." (Ex. W–5).

The next day, Monday, April 24, agent Dobson asked Mrs. Nichols to sign a consent form to allow the FBI to return to the Herington house to search for and seize a Shop Vac vacuum cleaner. Mrs. Nichols signed the form with the same "without prejudice" notation. (Ex. H–1).

At 9:40 p.m. on that Monday evening, agents Mary Jasnowski and Eugene Thomeczek obtained another written consent from Mrs. Nichols to search the residence and seize the Nichols' family dishes. When Mrs. Nichols signed she again wrote the notation "without prejudice UCC 1–207." (Ex. I–1).

On the following day, April 25, at 3:17 p.m., FBI agents procured yet another consent from Mrs. Nichols to search the Herington house. (Ex. J–1). Mrs. Nichols testified that she continued to cooperate in the hope that it would help her return to the Philippines.

On several occasions during her days with them, Mrs. Nichols told the agents that she wanted to be in her house in Herington. They told her that she could not live there because she would be badgered by the media, and there would be bills to pay. Chief Kuhn had also said to her that the Herington police could not provide for her safety if she returned to the residence, fearing the possibility of some vengeful or retaliatory act against her and her child.

On April 26, Mrs. Nichols made a telephone call to Terry Nichols, after agreeing to permit the FBI to tape record the conversa-

tion with a signed consent and the same UCC notation. She spoke the following words during that call:

> I—I don't really want to stay here because, you know, I don't know—I don't have vehicle. I can't—I'm totally helpless.
>
> I'm depending on these people here and uh—I don't wanta give any hassle to anyone.

(Tr. p. 762.) As will be discussed later, those comments, for whatever reason, overstated the circumstances and her reaction to them. She knew she was being recorded. On April 30, the FBI made a consensual tape recording of a telephone call between Mrs. Nichols and Robert Nichols, Terry Nichols' father.

On May 3, agent Dobson presented Mrs. Nichols with additional consent forms to search the house and truck, saying that the FBI needed to make another search.

On May 8, 1995, the FBI agents told Mrs. Nichols that they were going to take her to Oklahoma City to appear before a grand jury. Believing that she may never again see the Herington house, she asked to go back there to pick up more of her possessions. Agents Thomeczek and Dobson and a third agent went in with her. While they were all in the house, agent Dobson asked for permission to take a kitchen mixer that Mrs. Nichols had mentioned in a previous interview. Mrs. Nichols acceded to the request, prompting agent Dobson to ask, "[What] else can we take?" Mrs. Nichols responded, in a joking manner, that the FBI could ... "take the whole house, as long as you're going to ... give me my money and send me to the Philippines." (Tr. p. 769.)

Mrs. Nichols was taken to the United States Attorney's office in Oklahoma City on May 9, where she met with FBI agents Hawkins, Thomeczek and Dobson, together with Assistant U.S. Attorneys Joplin and Holmes. Donna Bucella from the Justice Department also participated in the meeting. No one told Mrs. Nichols that she had a privilege to refuse to testify against her husband, and no one told her about a privilege to refuse to disclose private marital communications.

During the interview Marife Nichols asked if she needed a lawyer and one of the government lawyers said that, because she was not a suspect, she did not need a lawyer unless she was not telling them the truth. After spending a half day with these lawyers and agents, Mrs. Nichols was told that her appearance before the grand jury would be postponed. She was given a subpoena to return to Oklahoma City on May 16, 1995. Mrs. Nichols was taken to Wichita and then to Kansas City, Missouri, for the convenience of the agents living there who went to their homes for the weekend.

Agents Thomeczek and Dobson took Mrs. Nichols back to Oklahoma City on May 17, the day after her subpoena date. The lawyers then told her that she would not have to testify before the grand jury because they thought that she had been telling them the truth.

At some time, while she was with the FBI agents, Mrs. Nichols and her daughter were fingerprinted and Mrs. Nichols gave hair samples without objection.

On May 19, 1995, agents Thomeczek and Dobson asked Mrs. Nichols to sign a consent to search form to enable the FBI to enter the Herington house to retrieve toys and clean out the refrigerator as she had earlier requested to do herself. (Ex. W–11).

Mrs. Nichols made many telephone calls during the days she was with the FBI agents. She talked with her relatives in California and with Terry Nichols' family in Michigan. She also talked with representatives of the Philippine government and met them personally on one occasion. She asked for, but did not get, help from anyone in reaching her goal of returning to her parents' home. The agents told her not to give anyone telephone numbers where she could be reached because the press would learn where she was and become a nuisance to her. The agents were not with Mrs. Nichols continuously. She and her daughter were left alone at times, and no agent stayed in or guarded the rooms in the hotels and motels where they stayed.

Mrs. Nichols did not get her money until after she talked with one of her husband's

lawyers, Ron Woods. She finally was given $4,800 on May 24, 1995, and the FBI then stopped paying for her support. Marife Nichols and her daughter immediately got on a bus to California and were then taken by a friend to the San Francisco airport for the long awaited flight to the Philippines.

### McVeigh Motion to Suppress FBI Seizure of Clothing and Personal Effects

■ The defense concedes that apparent violations of Oklahoma's motor vehicle laws gave Trooper Hanger probable cause to stop the automobile Timothy McVeigh was driving and that his possession of the gun and knife gave probable cause for his arrest. The booking search and the taking of Timothy McVeigh's street clothing and personal effects at the Noble County Jail are not challenged. Although counsel questioned the lack of a formal protocol for this necessary procedure, the evidence shows that the sheriff's staff followed their normal practices in putting Mr. McVeigh's property in a room where other prisoners' property was stored.

The motion to suppress any evidence obtained from Mr. McVeigh's clothing and personal effects is based on the contention that the transfer of his property to the FBI and the taking of it to the FBI laboratory in Washington D.C., without presenting a warrant to the Noble County Sheriff, violated the rights of Mr. McVeigh protected by the Fourth Amendment to the United States Constitution.

Timothy McVeigh puts forth *Brett v. United States*, 412 F.2d 401 (5th Cir.1969), as precedent in support of his argument that a warrant was required for the seizure and laboratory inspection of his clothing and personal effects. There, as here, the defendant was arrested, taken to jail, and given institutional garb in exchange for his clothes which were placed in a bag in a property room for safekeeping. Three days later, the investigators searched that clothing and found a packet of heroin in the watch pocket of the defendant's pants. In a divided opinion, two judges on the three-judge panel determined that the late search infringed the defendant's right of privacy. The court's reasoning flowed from the basic premise that all warrantless searches are presumed to be unreasonable and that there had been no showing of exigent circumstances justifying the failure to request authority from a neutral magistrate.

The government counters with authority from the Supreme Court in *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In that case Edwards was lawfully arrested and placed in a jail cell late in the evening. He was charged with attempting to break into a post office, and the crime scene showed evidence of a forcible entry through a window, leaving paint chips behind. Because substitute clothing was not available, the defendant stayed in his street clothes until the next morning when new clothing was purchased for him. The clothes worn at the time of his arrest were then taken and examined. They contained paint chips matching the samples taken from the window. A majority of five justices, speaking through Justice White, determined that the delay in the taking and testing of the clothing did not change the analysis that would have characterized this action as a permitted search incident to an arrest and routine booking of a person lawfully arrested. Justice White framed the question as follows:

> The question here is whether the Fourth Amendment should be extended to exclude from evidence certain clothing taken from respondent Edwards while he was in custody at the city jail approximately 10 hours after his arrest.

*Id.* at 801, 94 S.Ct. at 1236.

In answering no and applying the familiar law authorizing a search incident to arrest, the Court quoted with approval the following language from the First Circuit in *United States v. DeLeo*, 422 F.2d 487, 493 (1970) (footnote omitted):

> While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest, in weapons, means of escape and evidence.

*United States v. Edwards*, 415 U.S. at 808–09, 94 S.Ct. at 1239–40.

In footnote 7 in its opinion the Court cited the Tenth Circuit case of *Baskerville v. United States,* 227 F.2d 454 (10th Cir.1955), among other cases, and noted that the *Brett* case was contra. Although it did not say so explicitly, the Court's reasoning was contrary to that of the Fifth Circuit in *Brett.* Justice Stewart, writing the dissent in *Edwards,* followed the same approach taken in *Brett* by rephrasing the question as whether the Fourth Amendment is to be ignored. Finding no justification for dispensing with the warrant requirement and holding to the traditional view that all warrantless searches are per se unreasonable and must be justified by some exceptional circumstances, the dissenting justices said that the warrantless search was unconstitutional.

The holding in *Edwards* supports a warrantless seizure of Mr. McVeigh's property in this case. The defense seeks to distinguish the case, arguing that because the search in *Edwards* was for evidence of the crime for which the defendant was arrested, the ruling is merely a reasonable extension of the well-established law permitting the police to make a warrantless search incident to an arrest. Here, two days after the arrest of Mr. McVeigh on local charges, the FBI was looking for evidence connecting him with the suspected bombing of a building in Oklahoma City, a very different and much more serious matter than the misdemeanor charges on which he was being held. The legal significance of that difference is not apparent. The Fourth Amendment protects the privacy rights of persons, not property. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The critical question here is what privacy right did Timothy McVeigh have, while he was lawfully in jail, to deny FBI access to the clothing and personal effects he was wearing and carrying at the time of his arrest. Fourth Amendment privacy rights are measured by an objective standard of reasonableness in light of the historical purpose of the Fourth Amendment. *Oliver v. United States,* 466 U.S. 170, 177–78, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984). If on April 21, 1995, the Noble County Sheriff could have taken and tested Timothy McVeigh's clothes for any evidence relating to the charges on which he was arrested

two days earlier, no societal purpose is served by precluding the FBI from doing the same thing to seek evidence for its investigation on the charges for which a court found probable cause to arrest him as a suspect.

In recent cases appellate courts have tended more towards a pragmatic analysis in search and seizure cases rather than the formalistic, formulaic approach taken in earlier times and used by the Fifth Circuit in *Brett* and the dissent in *Edwards.* There is more emphasis on the reasonableness of the police conduct and whether the purpose of deterring misconduct would be served by application of the exclusionary rule in particular factual circumstances. *Arizona v. Evans,* —— U.S. ——, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Viewed from the perspective of law enforcement agents, there is nothing unreasonable in the FBI accepting custody of the property of the prisoner when they took him from the custody of the Noble County Sheriff and then testing that property in a laboratory. The sheriff testified that he has never been given a search warrant before transferring a prisoner and his property to the custody of other law enforcement agents.

This transfer of custody of Timothy McVeigh from the Noble County Sheriff to the agents of the FBI was lawful because the agents had an arrest warrant from a federal district court. The transfer of his personal property was incidental to the transfer of his person. The opinion deciding *Edwards* would have authorized the Sheriff of Noble County to have sent his prisoner's property for testing for evidence of the crimes for which he was detained. That would have been a reasonable search. There is nothing about the FBI taking the same property and examining it for evidence relating to the crimes for which the federal arrest warrant was issued that transforms what would have been a reasonable search and seizure by the sheriff into an unreasonable one done by the FBI. A contrary ruling would require the adoption of a sort of sliding scale definition of a prisoner's right of privacy, extending it according to the seriousness of the charges being investigated.

This case is also different from *Brett* and the other cases cited by Mr. McVeigh because the proposed seizure of his property had been judicially reviewed by Magistrate Judge Howland in Oklahoma City, who issued an authorizing warrant before the seizure was effected. The only shortcut taken by the FBI agents in this case was the failure to present a copy of that search warrant to the Noble County Sheriff. That omission can hardly be considered the type of police misconduct that warrants suppression of evidence which is assumed to be otherwise admissible at this stage of the proceeding.

Mr. McVeigh's counsel contend that the mere existence of a search warrant does not justify a search conducted without the use of it, noting that the search warrant signed by Magistrate Judge Howland was returned unexecuted and expired by its terms on April 28, 1995. A *per curiam* decision of the Sixth Circuit Court of Appeals in *United States v. Griffin*, 502 F.2d 959 (6th Cir.1974), has been cited as support for this position. There narcotics agents had developed probable cause for the search of an apartment, dispatched an agent to procure a search warrant, and then, rather than waiting for the warrant, proceeded to forcibly enter the apartment, discovering a quantity of narcotics and related paraphernalia. The government argued an inevitable discovery analysis because a search warrant was later obtained without the use of any information resulting from the early entry and a thorough search followed. The court found no exigent circumstances justifying a warrantless entry and said that, in the absence of exigent circumstances, police may not force an entry to a home simply because they think they have probable cause.

This court has no disagreement with the result in that case and finds it to be distinguishable because the right of privacy in a home is qualitatively different from the privacy interests of a person lawfully in custody in the clothing and effects in his possession at the time of his arrest. Moreover, in *Griffin* the police acted prematurely—before a judicial evaluation of probable cause. They made their own decision, and the court was concerned that application of the inevitable discovery doctrine would encourage such police shortcuts. Here, judicial approval was given before the seizure.

It is also significant that agent Hupp did not act on his own initiative in taking the property. He was directed by high-ranking officials who had also directed the procurement of the search warrant and knew that it had been issued. Those in command of the investigation had the assurance that they were proceeding with the formal approval of a neutral magistrate. They did not ignore the requirement for a warrant. Seen in context, the FBI sought and obtained a judicial determination of probable cause for the action that it took, and to hold that the results of the laboratory tests could not now be received in evidence simply because no copy of the warrant was exhibited to the sheriff of Noble County, Oklahoma would not only be contrary to established law, it would defy common sense.

### Motion to Suppress Statements of Terry Nichols

Terry Nichols claims that all of his statements made to the FBI agents on April 21 and 22 should be suppressed because he was a captive of the FBI, held under coercive circumstances, and did not knowingly and voluntarily waive his Miranda rights.

The government's first response is that an adequate *Miranda* warning was given and a valid waiver of the rights to remain silent and to have the assistance of counsel was made by Terry Nichols before he made any statements of evidentiary interest. In reply, Mr. Nichols contends that his consent was the product of deliberate deception by the FBI in both what they did and did not tell him. The defense asserts that this pattern of deception began when the agents told Terry Nichols that he was free to go; it continued when agent Smith said he would provide a copy of his notes of interview; the agents failed to inform him that the FBI had targeted him as a suspect in the case; they failed to tell him that he was going to be arrested on a material witness warrant; they misrepresented their intentions when they assured him that he or his wife would be

present during any search of their residence; they did not disclose that a lawyer had notified them that he was prepared to represent Mr. Nichols and they delayed in taking him before a judicial officer after his arrest. In addition to arguing that the totality of these circumstances requires a ruling that Terry Nichols' statements were involuntary, counsel contends that admission of this evidence would violate the Due Process Clause as well. This aggregation of arguments presents both legal and factual questions requiring separate analyses.

### Terry Nichols Statements Were Voluntary

■ In determining what effect must be given to a state court ruling that a person under interrogation was not in custody for *Miranda* purposes in a federal habeas corpus proceeding, the Supreme Court recently instructed that the "in custody" determination, triggering *Miranda* rights, is a mixed question of fact and law. *Thompson v. Keohane,* — U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). In reaching that result, the Court, through Justice Ginsburg, gave this direction to courts making the "in custody" determination:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Id.* at ——, 116 S.Ct. at 465 (footnote and citation omitted).

The detailed circumstances surrounding the interrogation of Terry Nichols have been set forth above.

■ Those in command of the investigation, particularly Mr. Shapiro, had instructed that if Mr. Nichols left the station, he was to be placed under close surveillance. They knew that they would seek a warrant for his arrest as a material witness. The agents were not given any explicit instructions as to what they were to do if he left the police station and tried to enter his house. There was, of course, a continuing concern that explosive devices and booby traps were inside the residence, and it is doubtful that the agents would have permitted Mr. Nichols free access to his property.

Terry Nichols and his wife were effectively under the control of the FBI. The answer to counsel's often repeated question during the suppression hearing is that Terry Nichols was not free to leave the station, get into his pickup truck, drive to his house, go in and sit on the sofa. While there can only be speculation as to the specific action the FBI would have taken if Mr. Nichols had attempted to do these things, it is clear enough that his freedom of action was sufficiently circumscribed to say that he was in a custodial environment.

The extent of that control was not known to Terry Nichols. Indeed, his unawareness of all of the actions taken by the FBI regarding him is the essence of the deception argument. What would a reasonable person in his position have "felt" about his freedom of action? The answer to this question changes over time. In the beginning, there was nothing to indicate to Terry Nichols that he was going to be arrested. He knew from telecasts and broadcasts that Timothy McVeigh had been named as a suspect in the bombing investigation and, presumably, that the FBI and other law enforcement agencies were conducting an extensive and intensive investigation of all possible leads to additional information. He knew that his name had been mentioned as one who had some association with Timothy McVeigh. He knew that many agents were in town, and he could readily conclude that they were there to find him and talk with him. He went to the police station to voluntarily avoid a confrontation with them—just as he said when he referred to "another Waco." Yet, a reasonable person in his position may well believe that he would be free to go if the agents accepted his statements explaining his activities and his associations with Timothy McVeigh.

As the interview progressed it must have been apparent to Terry Nichols, as it would be concluded by any reasonable person in his situation, that he was not going to be going home with his wife and daughter. Indeed, that is what he was overheard telling her when she came to see him in the basement shortly before 9:00 p.m. It is difficult to fix a definite time when he was in custody under the legal standard of the *Thompson* case; but, certainly that was his status when he acknowledged it by that statement to his wife.

There was a valid *Miranda* warning given before any substantive questioning took place and before any material statements were made by Terry Nichols. For the present purpose, it is assumed that the rights of a person in custody as a material witness are, in this respect, identical with those of a person arrested as a suspect. The question is whether Terry Nichols validly waived his rights and consented to talk without the assistance of an attorney.

Defense counsel argue Terry Nichols' refusal to sign the *Miranda* form and his statement that the word "interrogation" reminded him of the Nazis, coupled with the statement that he did not want another Waco incident, all indicate coercion. In essence, it is claimed that Mr. Nichols went to the police station to surrender himself to the FBI to avoid harm to himself and his family when the FBI came to get him as he assumed they would. Thus, this defendant is portrayed as a frightened and confused man reacting to the prospect of a confrontation with the awesome power of the federal government under alarming circumstances. The court accepts the view that fear was one of the motivating factors in Terry Nichols' decision to go to the police station and that he was afraid to leave the station on his own. He wanted some protection.

While the question of custodial status must be decided under an objective standard, the voluntariness of a waiver of constitutional protections and an informed, voluntary consent to answer investigators' questions are subjective issues. Thus, the court must determine, on this evidentiary record, whether Terry Nichols made a knowing and voluntary decision to talk with the two teams of FBI agents questioning him during the nine hours that he was in the Herington police station. The short answer to that question is yes. There is nothing in the evidentiary record to contradict the testimony of the interviewing agents that Mr. Nichols was calm and deliberate in demeanor. There were no signs of coercion, such as the display of firearms, or anything other than a conversational tone up to the time of the accusatory confrontation by agent Jablonski just before the arrest. The evidence does not suggest that Mr. Nichols' will was overborne and "his capacity for self-determination critically impaired" during the nine hours that he was in the Herington police station. *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir.1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).

Moreover, the content and tenor of the statements made are entirely consistent with a consent to continue the interviewing. That aspect of the case is discussed later in considering the admissibility of these statements against the defendant McVeigh under Fed. R.Evid.Rule 804(b)(3) as statements against penal interest.

The court finds from this record that Terry Nichols knew his rights, waived them and did what he could to explain the seemingly suspicious circumstances surrounding him on April 21, 1995. In reaching this result, the court does not make any finding regarding the truth or falsity of the reports of the statements made and the explanations given. Indeed, it is not possible to do so on so limited a record as that now under submission.

There was no deliberate deception in the agents' statements to Mr. Nichols that he was free to go and was not under arrest. They knew that they did not have any authority to make an arrest, and while there was an overall plan for close surveillance, the agents in the police station did not know what directions they would be given if Mr. Nichols had elected to leave.

Agent Smith's response to Terry Nichols' inquiry about the possibility of obtaining a

copy of the interview notes does not give rise to any finding that the waiver of rights was conditional. The comment was made when agent Smith was reviewing the notes for the two agents who joined the conversation in progress, as previously noted. Mr. Nichols did not make his request any more specific or say anything to indicate that his continuing to talk was in any way conditioned upon receipt of a copy of the agent's notes. Agent Smith testified at the suppression hearing that in making his response he was thinking that under the discovery rules a copy would be provided to Terry Nichols as a defendant. The probability is that agent Smith had no specific intention of providing these notes at any particular time and was simply providing reassurance to continue the interview. That does not, however, destroy the voluntariness of the statements made by Mr. Nichols. It is significant that Mr. Nichols continued to want to talk to the FBI agents on the following day when he knew that he was under arrest as a material witness and was on his way to court. There is no testimony that during that time he repeated his request for a copy of the notes.

The agents did not misrepresent their intentions when they told Mr. Nichols that either he or his wife could be present during any consent search. Counsel for the government have accepted the defense position that the consent of Terry Nichols was conditional, and, accordingly, do not seek to justify any of the searches and seizures now in dispute on the grounds of Terry Nichols' consent, independently of that of his wife. As will be discussed, Marife Nichols voluntarily consented to several entries and seizures without making any condition upon them, and her consent was sufficient in itself.

■ The FBI was not legally required to inform Terry Nichols as to the level of their interest in talking with him. Even if it is assumed that those who were supervising the entire investigation considered him as a probable participant in the crime under investigation, the Supreme Court has held that the validity of a *Miranda* waiver is not dependent upon a fully informed declarant. In *Colorado v. Spring,* 479 U.S. 564, 576, 107 S.Ct. 851, 858, 93 L.Ed.2d 954 (1987), the

Court made a distinction between the voluntary and knowing nature of a waiver as compared with the wisdom of it, citing its previous opinion in *Moran v. Burbine,* 475 U.S. 412, 422, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). In *Patterson v. Illinois,* 487 U.S. 285, 296, n. 8, 108 S.Ct. 2389, 2397, n. 8, 101 L.Ed.2d 261 (1988), the Court noted that the desirability of informing an accused of an indictment can be reasonably debated. The courts of appeals have, since *Patterson,* concluded that such a disclosure is not required. See *United States v. Chadwick,* 999 F.2d 1282, 1284 (8th Cir.1993), citing cases from the Second, Third, Fourth, Seventh and Ninth Circuits. See also *United States v. Valdez,* 16 F.3d 1324 (2d Cir.), *cert. denied sub nom. Mock v. United States,* —— U.S. ——, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994) for an extreme case. These authorities also support the conclusion that it was not required that the FBI disclose to the interrogating agents and, in turn, to Mr. Nichols, that a warrant for his arrest had been issued in Oklahoma City.

■ Mr. Nichols' counsel has argued that if Mr. Nichols had known all of the circumstances surrounding his interrogation he would have made a different choice about talking with the agents. In *Moran,* 475 U.S. at 422, 106 S.Ct. at 1141, the Supreme Court held that events occurring outside of a suspect's presence and unknown to him, including a telephone call from a lawyer seeking to represent him, have no bearing on the capacity and freedom to waive *Miranda* rights. It is suggested that if Mr. Nichols had been told that the Kansas Federal Public Defender had volunteered to represent him, that the FBI had control of his house and vehicle, and that he was about to be arrested and detained as a material witness because the agents had a strong suspicion of his complicity in the crime, he would at least have asked for counsel and in all probability would have refused to make any statements or answer any questions.

This suggestion is contradicted by Mr. Nichols' conduct on the following day, April 22, when he was taken by agents Smith and Crabtree from Abilene to Wichita for his appearance in court. He then well knew he

# 1562

had been accused of lying to FBI agents; he had been arrested; he was on his way to court and he was aware that he would soon have counsel appointed for him. Nonetheless, he began a conversation with the agents by asking whether the search of his residence had taken place. Upon being told that no search had been done, Terry Nichols reaffirmed his consent by offering further assistance in again describing the location of firearms in his house and expressing the hope that the persons conducting the search would be able to tell the difference between explosive materials and cleaning compounds. This conversation was consistent with what Mr. Nichols had said at the Herington police station. Notably, Mr. Nichols did not say anything to suggest that his earlier consent to search was conditioned by a requirement that he or Mrs. Nichols must be present, and he did not recant or attempt to withdraw or explain any of his earlier statements. He continued his effort to show himself as fully cooperative when he was in the custody of the U.S. Marshal in Wichita by telling deputy Ingermanson that he wanted to see the FBI agents again before going to court.

The most recent discussion of the level of coercion which would make a defendant's confession involuntary in the Tenth Circuit is *United States v. McCullah,* 76 F.3d 1087, 1101 (10th Cir.1996), in which the court reviewed the relevant authorities. In sum, considering the applicable law and adding all of the suggested coercive factors together, there is no basis for suppression of the Nichols' statements. The government has borne its burden of demonstrating a knowing and voluntary waiver of *Miranda* rights and that all of the statements in question were made knowingly and voluntarily.

### The Arrest Warrant Was Valid

■ Counsel for Terry Nichols made the general challenge that there was no probable cause for the arrest of Terry Nichols as a material witness and that any statements from him following the execution of the arrest warrant in the first hour of April 22 should be suppressed because of the taint from an illegal arrest. The applicable stat-

ute is 18 U.S.C. § 3144, the pertinent part of which reads as follows:

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title.

The affidavit of Henry Gibbons was presented to Chief Judge Russell as support for the subject arrest. After reciting why the testimony of both James and Terry Nichols is required before the investigating grand jury, agent Gibbons made the following statement:

> Terry Nichols' renunciation of his U.S. citizenship and his association with Tim McVeigh, a person involved in such a heinous crime, indicates that his testimony cannot be secured through the issuance of a subpoena.

(Ex. 22).

■ The burden on the government under the statute is to show probable cause to believe that it is or *may be impracticable* to rely on a subpoena to get the witness before the grand jury. Two federal district judges, Chief Judge Russell in Oklahoma City, and Judge Monti L. Belot in Wichita, Kansas, found Mr. Gibbons' affidavit to constitute an adequate showing.

The reference on the face of the warrant to an attempt to flee the jurisdiction of the United States was mistakenly copied from the face of the Ahmed arrest warrant. That reference is not in the supporting affidavit for the Nichols warrant and is not a part of the showing of probable cause. The defense has not discredited the affidavit, and upon examination of it, this court joins Judges Russell and Belot in finding it sufficient under the statute.

### There Was No Denial of Due Process

■ As a separate argument for suppression of Terry Nichols' statements, counsel argues that Mr. Nichols was denied due process of law because he was denied the

right to a meaningful hearing in a timely manner. Counsel cite *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a case involving denial of social security disability benefits. Recognizing that Mr. Nichols did receive a hearing before Judge Belot, with the benefit of appointed counsel on April 22 and continued to April 26, the defense argues an unreasonable delay before the FBI took him before the court in Wichita. *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Assuming that the rights of a person arrested as a material witness under 18 U.S.C. § 3144 are the same as an arrested suspect, there was no violation of those rights in this case. There is no constitutional right to be arrested as soon as probable cause for an arrest has been shown. *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966); *United States v. Beltran,* 917 F.2d 641, 643 (1st Cir.1990); *United States v. Toro,* 840 F.2d 1221, 1233–34 (5th Cir.1988). In *United States v. Drake,* 655 F.2d 1025, 1027 (10th Cir.1981), the court cautioned that agents may not delay an arrest to gain a tactical advantage. Here, the delay was to permit the voluntary interview, a purpose recognized as valid in *Hoffa.* There was no unreasonable delay in holding the initial appearance at Wichita on the same day as the arrest. The transfer to Oklahoma City was delayed at the request of Mr. Nichols counsel for a stay of the removal order. (Ex. 35 at p. 62–64).

### Residence Searches

A comprehensive search of the Nichols' residence on April 22, 1995, was done with the approval of a search warrant issued by U.S. District Judge Belot in the District of Kansas at 11:20 a.m. on April 22. The defense challenges the validity of that warrant by attacking the supporting affidavit of agent Scott Crabtree because he included the observation of agent Reightler, distorted the statements of Terry Nichols and included a statement that agents noted an odor of fertilizer at the residence.

At paragraph 19 of his affidavit, agent Crabtree reported the observation made by agent Reightler as follows:

While Nichols was being interviewed, he gave consent for agents to search his residence and his pickup. Due to imminent darkness and safety concerns, the agents elected not to search the house at that point. However agents did go to the property and observed four fifty-five gallon plastic drums in Nichols's garage. Two of the drums had blue plastic lids which resembled the plastic fragments found during the bomb scene analysis in Oklahoma City. In addition agents noted a strong odor of fertilizer near the garage.

Defendant Nichols contends that when agent Reightler looked into the garage window on the night of April 21 he made a warrantless intrusion into the curtilage in violation of the Fourth Amendment because there were no exigent circumstances. Agent Reightler testified that he thought he was acting with consent of the property owners. The government has conceded that Terry Nichols' consent was conditioned upon a requirement that he or his wife must be present at the time of search.

Marife Nichols gave her unconditional consent to a search of the residence. The defense contends that her consent was involuntary because of the coercive circumstances surrounding her at the Herington police station.

A finding of a free and voluntary consent to search under the totality of the circumstances requires the government to proffer clear and positive testimony that consent was unequivocal, specific, and freely and intelligently given without implied or expressed duress or coercion. *United States v. McRae,* 81 F.3d 1528, 1536–37 (10th Cir. 1996). *See also United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir. 1995). For the reasons set forth below, the court finds that Marife Nichols' consent was valid. Agent Reightler's two looks into the window did not violate the Fourth Amendment rights of Terry Nichols. Even assuming agent Reightler's observation was made in a violation of the Fourth Amendment, deleting it from the affidavit has no signifi-

cant effect on a determination of probable cause.

■ The defense asserts that agent Crabtree misrepresented and distorted the statements the agents heard from Mr. Nichols. These statements are paraphrased in paragraph 17 of the Crabtree affidavit. Subparagraph (d) reads as follows:

Nichols admitted that he knows how to make a bomb by blending ammonium nitrate with diesel fuel, which he stated could be detonated by either blasting caps or dynamite. Nichols also stated that he had ammonium nitrate at his residence until Friday, April 21 at which time he placed it on his yard as fertilizer. Nichols said that he did this after reading (in several different newspapers) that ammonium nitrate was used in the Oklahoma City bombing.

(Ex. 19).

The agents' 302 report related that Terry Nichols said he had been at a gun show in Tulsa next to an individual who had a booth selling items related to explosives; that Mr. Nichols had discussed bombing literature; that he said a farmer had related blowing tree stumps using ammonium nitrate and diesel fuel in a mixture and that someone at a gun show had talked of mixing it for explosions involving quarry/rock work. The agents also reported that when questioned about first-hand knowledge, Mr. Nichols said "I have not made any, so I do not know if the mixture stays granular or becomes liquid", and that he assumed that electric blasting caps could be used for detonation. They also reported that Mr. Nichols said he had ammonium nitrate that he was going to sell at gun shows in small packages with accompanying instructions for use as plant food, and that he put the remainder of it on his lawn that morning and had not mentioned that earlier to the agents because it would "make me look guilty to a jury." The quoted language from the affidavit is not such a distortion of these statements as would change the import of them.

■ In subparagraph (e), agent Crabtree said:

Nichols also said that he had a fuel meter in his garage. He stated that he purchased this item for resale purposes.

(Ex. 19). In their 302 report, the agents related that Mr. Nichols advised that he had bought a fuel meter at Fort Riley with the intention to sell it and paid only a percentage of the original price. The agents testified that Terry Nichols told them that the fuel meter was inoperable. The failure to include that statement does not change the significance of this item in the affidavit. In reviewing an affidavit to determine probable cause for a search for evidence, the judicial officer may consider suspicious circumstances. The presence of a fuel meter in Terry Nichols' garage, whether in working condition or not, is such a circumstance. The fact that Mr. Nichols said that the fuel meter was not operable on April 21 does not preclude the possibility that it was in working order in Mr. Nichols' possession at some earlier time. A judge may be somewhat skeptical of such explanations where the aggregate of the information gives rise to a probability that a search may reveal some evidence concerning a crime.

Comparing the agents' testimony and their 302 report about Terry Nichols' statements with the recitals in the Crabtree affidavit, the court finds no significant differences. If the Crabtree affidavit had been identical with the agents' 302 report and testimony about what Mr. Nichols told them, there would be probable cause for the search for evidence based upon all of the information provided, which included material from other sources.

Another challenge to agent Crabtree's affidavit is that he "shaded the truth" when he said that agents noted a strong odor of "fertilizer" near the garage. Agent Reightler testified that he smelled an "ammonia-type" odor. The defense presented evidence that ammonium nitrate fertilizer does not have such a smell. The court need not decide this point because the reference to the smell of fertilizer in the Crabtree affidavit is not necessary for a finding of probable cause, given the other information provided to Judge Belot within the four corners of the document.

A search was conducted on the morning of April 23 at the Herington residence of Mr.

and Mrs. Nichols. It was done with the consent of Marife Nichols and, because she was with the agents in the house, it was also consistent with the condition imposed in the consent given by Terry Nichols.

Another search warrant was issued in Kansas on April 29, 1995. While no evidence was recovered, the agents observed a Mikita drill and drill bits which became the objects of another application for a search warrant on May 2, 1995. Accordingly, the validity of the April 29 search has been challenged, principally upon the same grounds as offered against the earlier warrant and the same ruling is applicable. The drill and drill bits were recovered on May 3, 1995, as a result of a warrant issued on the previous day. Again the only flaws in that affidavit would be those previously argued in the earlier warrants.

There were many additional entries into the Nichols' residence, all based on the consents given by Marife Nichols during the days she was with agents Thomeczek and Dobson. While it is not clear on the present record whether the admissibility of any evidence is dependent upon the validity of those searches and seizures, it is appropriate now to rule on the issue of those consents to avoid possible delays during trial.

### Marife Nichols Gave Valid Consents to Search

The defendant Nichols suggests that from the time FBI agents Thomeczek and Dobson, together with CID Agent White, went to Abilene with Mrs. Nichols to the time she boarded a bus to California en route to her return to her homeland, this young Filipino woman was in the custody of federal agents and held incommunicado with the sinister purpose of getting her to consent to these searches and to make statements incriminating her husband. The government counters that the agents acted as assigned companions to support and protect Marife Nichols and her young daughter because they had no other support for their subsistence. The truth appears to be somewhere in between these versions.

There was a legitimate law enforcement purpose to keep Mrs. Nichols out of her house during that first weekend, April 22–23.

The news media coverage of the investigation was extensive in scope and intensive in focus on all persons who were subjects of FBI interest. Moreover, at least before the warranted search conducted on April 22, the agents had reason to suspect that there may be some hidden danger within the property, perhaps unknown to Mrs. Nichols. The decision to exclude her from the residence during that first weekend was a reasonable response to the known and unknown circumstances.

The most disturbing fact is the withholding of Marife Nichols' money for more than 30 days. The first excuse given by the agents in denying her request for her money was that they wanted to test the items for Timothy McVeigh's fingerprints. The record does not disclose whether or when any such test was made. Thirty days is more than enough time to complete the necessary procedure. Moreover, there is no apparent reason that the FBI could not have paid her $5,000 and retained the particular bills. The submitted evidence did not include any information as to the method of payment when Mr. Woods was able to persuade the government to release $4,800. The arguable inference is that knowing that this money was the only resource Marife Nichols had to pursue her plan to return to the Philippines, the FBI held it hostage to force her cooperation in the investigation.

Another disturbing issue is that the government lawyers misused a grand jury subpoena to question Marife Nichols in the United States Attorney's Office in Oklahoma City on May 9. Apparently another attempt was going to be made with a second subpoena ordering her back to Oklahoma City on May 16. Mrs. Nichols was finally released to go her own way when the government's lawyers decided that any testimony from her would not be helpful to them.

Terry Nichols' lawyers suggest additional improprieties color the government's conduct in darker hues. They point out that no one offered to provide counsel to advise Mrs. Nichols and that she was never told about the marital confidential communications privilege or that she had a spousal privilege to refuse to testify against her hus-

band. See *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). That in itself did not invalidate any of her statements or consents because these privileges are evidentiary rules of exclusion and do not have a constitutional foundation.

These matters do not rise to constitutional dimensions. The legal conclusion to be drawn from all this is that even assuming bad faith and misconduct by these government agents and lawyers, there is no basis for the extreme sanction of suppressing any admissible evidence derived directly or indirectly from it. Taken as a whole, the evidence now before this court does not support a finding that Mrs. Nichols was coerced into cooperating or that her consents were not voluntary under the applicable legal standard.

Having listened to the testimony of Marife Nichols as a witness at the suppression hearing and observing her demeanor on the stand, the court finds and concludes that despite her young age and her family background and living circumstances in the Philippines, Marife Nichols had the capacity to control her choices of action and freely exercised it in dealing with these FBI agents. The fact that she was separated from her husband did not prevent her from exercising her free will. Indeed, the court is struck with the fact that nothing in the testimony indicated that she asked about the welfare or circumstances of Terry Nichols. Her constant and consistent interest was in getting her money and getting back to the Philippines. Apart from the retention of the funds, the government made no effort to prevent that from happening. She did contact representatives of the Philippine government and her own relatives as well as Mr. Nichols' family. While much is made of the government requirement that she consent to recording conversations by telephone with Terry Nichols and his family, she was left alone to contact anyone she wanted to, and the persons with whom she did communicate gave no assistance to her and left her to her own devices.

Marife Nichols voluntarily consented to searches of her residence and the pickup truck, without any qualifications, on April 21, 1995, at the Herington police station. She was then sufficiently aware of the FBI's interest in her husband and his activities to know that such searches could have serious consequences. Her decision was based on her belief that there was nothing to hide. She asked reasonably and appropriately whether she had the authority to consent to search property owned by her husband. The agents told her that he would be asked for his consent as well and, indeed, he gave it.

On that Friday afternoon and evening, Marife Nichols had no reason to believe that events would unfold as they did. She could reasonably expect that she would soon have her money and be on her way to the Philippines. There were no coercive circumstances surrounding her signing the original consent to search forms, and she did not qualify her consent. (Ex. 14–A & 14–B). All of the subsequent consents were an extension of this original choice and each was for a particular identified purpose. Having once given a general consent, it would appear to her that any subsequent refusal of a specific request would be interpreted as an attempt to hide or conceal something and her principal motivation, as she testified, was to show that she had nothing to hide.

Marife Nichols is not a person who is in awe of authority. She falsified documents necessary to her marriage and entry into the United States by misrepresenting her age. She demanded on at least two occasions to talk to the supervisors of agents Thomeczek and Dobson to assert her rights. She demonstrated by her demeanor on the witness stand and her answers to cross-examination by government counsel at the suppression hearing that she has a command of the English language, a knowledge of her basic rights, and a willingness to assert them. In the calculus of voluntary consent the issue is whether there was a free choice—not whether the consent was motivated by a desire to be helpful to the investigation.

Over all, the conclusion is that after the arrest of Terry Nichols, the government assigned agents to Marife Nichols as companions with the primary purpose of protecting her welfare, and their conduct toward her did not override her freedom to decide whether

to consent to any searches and seizures or to talk with them.

*Government's Motion In Limine Regarding Statements of Terry Nichols*

 Testimony at trial from FBI agents relating what Terry Nichols told them is inadmissible hearsay as to defendant Timothy McVeigh, if offered for the truth of the matters asserted, unless the prosecution can fit them within a well-recognized exception to the hearsay rule and the statements are shown to be sufficiently reliable to satisfy the Confrontation Clause of the Sixth Amendment to the United States Constitution. The government filed a motion *in limine* seeking a pre-trial ruling that some of these statements constitute admissible evidence against Mr. McVeigh because they were made as statements against Terry Nichols' penal interest. Rule 804(b)(3) provides, in pertinent part, that if the declarant is unavailable as a witness, the hearsay rule does not exclude "A statement which at the time of its making ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid., Rule 804(b)(3). Some of the papers filed in support of and opposition to this motion were sealed to avoid any possible prejudicial effect of pre-trial publicity regarding such statements. Closure of this part of the clerk's file is necessary to prevent widespread publicity about reports of statements made by Mr. Nichols which will not be received as trial evidence in support of charges against Timothy McVeigh.

The government recognizes that many of the statements attributed to Terry Nichols by the FBI agents who talked with him on April 21 and April 22, 1995, are not within this limited exception to the hearsay rule. Government counsel contend that agents' testimony as to three "core admissions" come within the exception. These are statements concerning: (1) a meeting with Timothy McVeigh in Oklahoma City and driving him to Kansas on April 16; (2) loaning a truck to Mr. McVeigh in Junction City, Kansas on April 18 and (3) the removal of items from a

storage locker in Herington, Kansas on April 20. These statements are summarized in agent Crabtree's affidavit for a search warrant. (Ex. 19).

The initial requirement for admissibility of statements against penal interest is that the declarant is not available as a witness. The definition of unavailability in Rule 804 includes a situation in which the declarant is exempt on the ground of privilege from testifying. Terry Nichols has that privilege. The government has no power to call him as a witness without a waiver or a grant of immunity. He is not now a witness available to the prosecution.

Both sides have cited the same case, *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), in support of their contradictory positions about the applicability of Rule 804(b)(3) to testimony concerning these statements of Terry Nichols. That anomaly results from their conflicting readings of the plurality opinion authored by Justice O'Connor. When considered with the concurring opinion by Justice Ginsburg, joined by three other justices, and the separate concurring opinion of Justice Scalia, the holding of six justices was that application of this exception to the hearsay rule requires a fact-intensive inquiry and that only statements truly inculpatory of the declarant may be admitted. The statements must be analyzed separately, particularly where there is a mixture of inculpatory and self-serving statements in a narrative. The Court remanded the case for further proceedings.

The Fifth Circuit, in turn, remanded the case to the trial court "for further proceedings consistent with the Court's opinion." *United States v. Williamson*, 47 F.3d 1090 (11th Cir.1995). That was a daunting task, considering that two justices directed a review of the record under Justice O'Connor's direction; three justices directed a review of the record under Justice Kennedy's direction in his concurring opinion and three justices joined Justice Ginsburg's instruction to make a harmless error analysis.

The government's contention is that the core statements attributed to Terry Nichols are self-inculpatory because they put him

**1568**

with the person under suspicion at the place of the bombing, Oklahoma City, on April 16 and at a place believed to be related to the crime one day before the bombing. While Mr. Nichols did not admit any criminal conduct, the government contends that these admitted acts become criminally significant in the context of what the prosecution intends to prove at trial. Thus, this case is said to be analogous to the hypothetical case posited by Justice O'Connor as follows:

> Moreover, whether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy.

*Williamson,* 512 U.S. at ——– ——, 114 S.Ct. at 2436–37.

The initial difficulty with this contention is that the court does not have the other evidence before it and may not speculate about what may be proved at trial as to Mr. McVeigh. Next, there is nothing to support any inference that Terry Nichols knew what information the FBI had about Timothy McVeigh on April 21, apart from the knowledge that he was being arrested on charges relating to the bombing. Finally, the significance of this hypothetical in the plurality opinion is greatly attenuated by the concurring opinion of Justice Ginsburg, expressing the view that in the case before the Court the arguably inculpatory statements were so closely intertwined with self-serving declarations as to make them untrustworthy. She further observed that under *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), persons under arrest have a strong incentive to shift blame to others, making their statements presumptively suspect and requiring the scrutiny of cross-examination under the Confrontation Clause.

In *United States v. Costa,* 31 F.3d 1073 (11th Cir.1994), the Eleventh Circuit interpreted the *Williamson* case to require the trial court to make a fact intensive inquiry into all of the surrounding circumstances to determine whether a statement is truly against interest. The court reversed the trial court's use of Rule 804(b)(3), holding the questioned custodial confession was not genuinely against the declarant's interest to the extent that it directly inculpated the defendants in a conspiracy.

The underlying premise for admissibility under Rule 804(b)(3) is that a reasonable person in the declarant's position would recognize that his statement so far tended to subject him to criminal liability that he would not have said it unless he thought it was true. The starting point for this analysis is to determine whether a reasonable person in the position of Terry Nichols at the Herington police station on April 21, 1995, would believe that these statements would tend to subject him to criminal liability. The crime in question is the suspected bombing of the Murrah Building in Oklahoma City on April 19. As set forth in the earlier findings, Terry Nichols voluntarily went to the Herington police station and agreed to talk with FBI agents to find out why he was being mentioned on television and radio broadcasts concerning the investigation of that bombing.

None of the statements under consideration is a direct admission of any criminal conduct by Terry Nichols as to that or any other event. None of the statements directly implicates Timothy McVeigh or shows that Terry Nichols assumed or thought that Mr. McVeigh was guilty of any crime.

Terry Nichols said that he had heard that Timothy McVeigh was being arrested in connection with the bombing investigation. When asked questions about his opinion as to whether Timothy McVeigh was involved, Terry Nichols gave varying responses. At one time he said that he could not believe that it was Timothy McVeigh, because when they met in Oklahoma City, it was because Mr. McVeigh's car broke down on his way back east to see his family. He also said that Mr. McVeigh expected to get an inheritance soon from his family and that he, Mr.

Nichols, could not see why Mr. McVeigh would do it. When he was apparently pressed on the matter and began to speculate as to the possibility that Mr. McVeigh was involved, Terry Nichols coupled his statements with complete denials of any awareness of or involvement in such activities. After saying that he did not know anything about the bombing, Terry Nichols professed his concern about his statements being misunderstood, saying that "in my eyes, I did not do anything wrong but I can see how lawyers can turn stuff around." At another time, after being asked whether he thought Timothy McVeigh was involved, Mr. Nichols reportedly said, "I feel upset that I am involved, in a sense, because of him, and knowing that I am not."

To grant the government's motion, the court must find that Mr. Nichols had the knowledge about the bombing that the government assumes to make his statements admissible—that is that Timothy McVeigh was a guilty participant in the crimes charged in this case. That finding would be unwarranted speculation from the evidence now before this court.

There are six general possibilities: (1) both Timothy McVeigh and Terry Nichols were among the perpetrators of these charged offenses; (2) neither of these defendants was involved; (3) Terry Nichols was a participant and Timothy McVeigh did not know it, (4) Timothy McVeigh was a participant and Terry Nichols did not know it; (5) Terry Nichols was a participant and Timothy McVeigh knew it and (6) Timothy McVeigh was a participant and Terry Nichols knew it. There may be other possibilities depending upon the number of participants and varying levels of knowledge.

Only the first of these six possibilities definitely supports admissibility against Timothy McVeigh of these reported statements of Terry Nichols—the assumption that he and Timothy McVeigh both had some participation in the bombing. Any such finding at this time would be nothing more than sheer speculation and conjecture. The last of the six possibilities—the assumption that Timothy McVeigh was a participant and Terry Nichols knew it,—could cause a reasonable

person with such knowledge to think that statements putting him with a perpetrator near the time and place of the explosion may tend to expose him to prosecution. However, the agents' reports and testimony do not provide a basis for finding that Terry Nichols had such knowledge about Timothy McVeigh or even thought him to be guilty.

Even if such knowledge is assumed, this testimony must be rejected as hearsay because the statements argued to be against penal interest are so intertwined with those that are self-serving that separation is not possible. The government says that it has evidence proving Mr. Nichols' explanatory and self-serving statements false; but it has not proved that the inculpatory statements are true. An inherent difficulty with evidentiary rulings on motions in limine is that the court does not have the benefit of viewing the disputed testimony in the context of other evidence.

On the present record, the court finds that, as a reasonable person, Terry Nichols did not expect that his statements to the agents would result in his being charged with some complicity in this crime. Quite to the contrary, the probability is, from all of the attendant circumstances, that Terry Nichols knew that he was under suspicion because of his association with the primary suspect and that it was in his self interest to initiate contact with the FBI to explain away anything that might be considered incriminating of himself.

Government counsel ask whether there would be any reason for Terry Nichols to place himself with Timothy McVeigh in Oklahoma City on Easter Sunday and in Junction City on Tuesday, April 18, if these statements were not true. The answer is that there are several possible scenarios which are contrary to the assumption that these must be true statements because they tend to implicate Mr. Nichols in criminal activity.

Mr. Nichols may have surmised that the FBI had information putting him in Oklahoma City on Easter Sunday and putting his truck in Junction City, Kansas two days later. If it is assumed his statements that Mr. McVeigh was present at those times and

places are false, the reasonable inference is that Terry Nichols was trying to transfer full responsibility to Timothy McVeigh, supporting the government's case against the arrested suspect to gain favor or to explain away any suspicion of himself. Counsel for Timothy McVeigh have noted how deftly some of the denials attributed to Terry Nichols implicate Mr. McVeigh, particularly in the context of what Mr. Nichols stated about their past activities together. The historical narrative of their previous relationship is clearly inadmissible hearsay.

Another possibility is that the complete narrative told by Mr. Nichols is entirely true, including the innocent purpose for him meeting Timothy McVeigh in Oklahoma City on April 16, the innocent purpose in loaning the truck to Mr. McVeigh in Junction City on April 18 and the innocent purpose in cleaning out the storage locker in Herington on April 20. Taking the reported statements of Terry Nichols as true in their entirety, they are consistent with either of two possibilities: (1) that neither of these two defendants had any involvement in the bombing or (2) that Terry Nichols had no awareness of or knowing participation in any involvement on the part of Timothy McVeigh.

The only circumstances shown by the evidence is that Terry Nichols voluntarily went to the Herington police station to find out why he was being mentioned on television and radio in connection with the investigation of the Oklahoma City bombing and, perhaps, to avoid potential dangers from possible confrontations with law enforcement agents, news media or an alarmed citizenry. He knew that the government was in the process of arresting Timothy McVeigh for some participation in the bombing of a federal building in Oklahoma City on April 19, and Terry Nichols knew he was under some degree of suspicion because of his past association with Mr. McVeigh. That is not enough to support a finding that these statements were against Mr. Nichols' penal interest.

The government has failed to satisfy the first requirement for application of this hearsay exception—that Terry Nichols made these statements as admissions tending to expose him to criminal liability.

Not only does the proffered testimony fail to meet the established criteria for admissibility under the exception, admitting these statements without cross examination would violate the Confrontation Clause of the Sixth Amendment. The law is well established that the right to cross-examine one's accusers is a vital and indispensable part of the right to trial, unless there are valid reasons why the witness is not available at trial, and there are such clear indicia of reliability of the statements as to be a functional substitute for testing the truthfulness of the statements in that time-honored method.

Counsel for the government are very selective in what they want the trier of fact to believe about what the FBI agents say that Terry Nichols told them. The statements offered as admissions are only those that fit into the prosecution scenario. The interrogating agents did not themselves believe most of what they said they heard from Terry Nichols. Agent Foley testified that "I believe Mr. Nichols wanted to tell us a story that night, which he did." (Tr. at 526). He acknowledged that taking one part of the 302 report from the rest of it can give a false impression. (Tr. at 530). Agent Jablonski gave his opinion in the following colloquy in response to Mr. Jones on cross-examination:

Q. Now, you also indicated in response to questions by Mr. Tigar that you formed the opinion that Terry Nichols wanted to be there.

A. That is correct.

Q. By there, you mean at the Herington police station?

A. I don't know if he particularly wanted to be at the Herington police station, but I believe he sure wanted to talk.

Q. Okay. What do you mean by that, that he wanted to be there? You didn't say he wanted to talk. You said Terry Nichols wanted to be there. What do you mean by that?

A. That's what I meant. He wanted to talk. He wanted to find out as much from us as he could about this situation, I felt, based upon my experience in interviewing lots of people.

Q. Okay. Did you think he was lying to you?

A. Yes, I did.

Q. Okay. Did you think he was making a lot of self-serving statements?

A. Definitely.

Q. Did you think he was trying to lead you astray?

A. Yes, and no.

Q. Do you think he was trying to point the finger at somebody else?

A. He was talking about somebody else but talking about his relationship with that other individual.

Q. That's not what I asked you. I asked you if you thought he was pointing the finger at somebody else.

A. He was pointing the finger at someone else but involved himself in that process.

Q. And was that someone else Tim McVeigh?

A. Yes, sir.

Q. But the literal answers he gave which you say involved himself were cast in an innocent explanation, weren't they? It was you that inferred they were inculpatory?

A. That is correct.

To admit only those portions from the interview that the government argues are within Rule 804(b)(3) puts statements out of context and would lead the jury astray just as agent Jablonski said he thought Terry Nichols attempted to do with the agents during the interview. When the declarant on the same occasion makes both inculpatory and exculpatory statements, the opportunity to cross-examine becomes an imperative both under the Sixth Amendment and for the fundamental fairness necessary for due process of law.

### RESERVED RULING

After the evidentiary hearing on the motions to suppress, counsel for Terry Nichols moved to supplement the record to add Exhibit W–83, containing an excerpt from a summary of telephone records prepared by the FBI, suggesting that they showed that someone had been using the telephone inside the Nichols residence during the afternoon and evening of April 21 or, alternatively that there were fundamental flaws in the phone records which supported government's Exhibit 64. The government objected. The motion was granted at the oral argument on July 15 and the court granted the government an opportunity to supplement the record with affidavits. On July 19, 1996, the government submitted supplemental exhibits 85 through 90 to provide additional information and explanation of the records. Mr. Nichols filed a response on July 25 and the government filed a reply on August 7. Considering these papers, the court is unable to make any finding as to either of the suggestions raised by defense counsel. The court will not delay ruling on these suppression motions by reopening the hearing to take additional evidence on this collateral issue which was not timely raised. Even if it is assumed that someone was in the house and used the telephone, there is nothing to suggest that any evidence or information relevant to the issues now being considered was obtained. There is nothing to show any taint resulted from any supposed intrusion. Any ruling as to the accuracy or reliability of the disputed records is reserved for trial.

Upon the foregoing, it is now

ORDERED, that the defendants' motions to suppress are denied and the government's motion in limine seeking admission of testimony concerning statements of Terry Nichols as evidence against Timothy McVeigh under Fed.R.Evid. 804(b)(3) is denied.