**UNITED STATES, Appellee,**

v.

**Heather L. LANNI, Defendant, Appellant.**

**No. 91–1391.**

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1991.

Decided Dec. 19, 1991.

---

Ralph J. Perrotta, Washington, D.C., by appointment of the Court, for defendant, appellant.

Edwin J. Gale, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

This appeal followed a conditional plea of guilty to a charge of embezzlement from a federally insured credit union in violation of 18 U.S.C. § 657. In entering the plea, under Fed.R.Crim.P. 11(a)(2), defendant-appellant reserved the right to appeal the denial of her motion to suppress statements made to FBI agents during an interview at her home. The sole issue is whether the district court erred in ruling, after a suppression hearing, that no *Miranda* warnings were necessary, because defendant was not "in custody." Although viewing this as a close case, we affirm.

A district court's findings in a suppression hearing are binding on appeal unless clearly erroneous, and we will uphold the district court's denial of a motion to suppress if any reasonable view of the evidence supports it. *United States v. Stanley*, 915 F.2d 54, 57 (1st Cir.1990); *United States v. Masse*, 816 F.2d 805, 809 n. 4 (1st Cir.1987). In sketching the underlying events of this case, we therefore select, where different versions of what happened were given, those facts favorable to the government.

Suspecting defendant of having·participated in the embezzlement of $7,000 from the Equitable Credit Union through processing a check at her credit union teller window, two F.B.I. agents went to her home between 8:00 and 8:30 a.m. on Monday, August 6, 1990. Defendant, just awakened, after viewing the agents through a window, hastily put on sweat pants and allowed the agents to enter. Special Agent O'Connor, who did all of the questioning, sat some ten feet away from defendant in the living room on an adjoining sofa, Special Agent Eaton sitting near O'Connor.

Apart from showing their credentials, identifying themselves, and indicating that they wished to discuss a matter with defendant, there was no other statement suggesting either that defendant was free to

terminate the conversation at any time or that she was not free. No *Miranda* warnings were given. The interview lasted for approximately four hours. When defendant's husband entered the living room shortly after the agents' arrival, O'Connor asked him if he would allow them to interview his wife alone. He acquiesced, went to the kitchen, and made breakfast for the couple's two-year-old son. He then sat with his son in the adjacent dining room, which opened onto the living room. Defendant did not request and did not have breakfast.

The next hour began with O'Connor's requesting biographical data and names of friends and acquaintances. He then asked defendant to describe in detail the procedures she would follow in cashing checks at the credit union. Finally, he asked defendant whether she had cashed the $7,000 check in question. Defendant denied having any recollection concerning it. During the morning, the two-year-old boy, a dog, and a kitten played in the living room area. At some point, defendant's father arrived, but was asked by defendant to come back later.

Then began another hour in which O'Connor asked defendant and her husband to provide handwriting exemplars. Each wrote ten checks with each hand, replicating the writing on the forged check, pursuant to step-by-step instructions from O'Connor. The date, the amount of money in words, the amount of money in numerals, and the signature were thus written out twenty times by each of the couple. The elapsed time was approximately one hour.

Then followed renewed questioning about the cashing of the check which became, to use the word of O'Connor, "intense." O'Connor indicated that defendant's explanation as to her lack of knowledge of the check did not make any sense. Defendant finally began to cry, said that she had been afraid of retaliation by others, then gave O'Connor an oral statement of her involvement, followed by a written statement, which took about 45 minutes to execute. Defendant's husband also gave a written statement. After breaking down, defendant asked to go to the bathroom, because she had not gone all morning. O'Connor allowed her to do so.

The district court, in a brief oral opinion, recognized that to be interviewed by police officers is not a pleasant experience, but that subjective apprehension was not the test. It noted that the interview was conducted by only two officers and took place in defendant's home. It added, "The only aspect of this matter that might suggest some kind of coercion is the duration and the character of the interrogation." But it concluded that defendant was not in custody at the time of the interrogation and *Miranda* warnings were not required.

■ In evaluating whether a suspect was in custody and thus entitled to *Miranda* warnings, we look to see, using objective standards, whether there was a manifestation of a significant deprivation of or restraint on the suspect's freedom of movement, taking into account such factors as " 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.' " *Masse*, 816 F.2d at 809 (quoting *United States v. Streifel*, 781 F.2d 953, 961 n. 13 (1st Cir.1986)).

Our assessment is not accomplished by a color-matching process, or by giving weights to various factors pro-and con-custody, and totting up the columns. Nevertheless it helps us view a case as either clear or close to isolate those factors that suggest restraint and those that suggest freedom of movement. The latter are these: there was no statement suggesting that defendant was not free to leave or terminate the questioning; the hour of 8:00 or 8:30 a.m. is not an outlandish one; the interview was in defendant's home, with her husband, child, and pets nearby; only two agents were present and only one did the questioning; there were no "tricks" such as a "good guy—bad guy" routine or the use of false information; defendant was freely allowed to go to the bathroom.

The factors suggesting restraint are these: there was no statement that defendant was free to leave or terminate questioning, or that she could refuse to execute handwriting samples; the appearance of the officers at 8:00 or 8:30 a.m. on a Monday morning obviously caught defendant before she had dressed, eaten, or prepared for the day; while in familiar surroundings, defendant did not eat or go to the bathroom during the entire morning; an agent requested defendant's husband to leave the living room; the overall lapse of some four hours was not only long in duration but of increasing intensity as defendant and her husband executed the handwriting samples, following some 160 separate instructions from Agent O'Connor (four written sections of ten sample checks for each hand of each person); an admittedly tense atmosphere existed near the end as the agent expressed his disbelief of defendant's profession of no recollection.

This ranging of factors highlights for us the fact that the case was not an easy one, as the district court realized with its singling out the duration and character of the interrogation as possibly suggestive of coercion. Defendant-appellant has cited her strongest precedent, *United States v. Griffin*, 922 F.2d 1343 (8th Cir.1990). In that case, two F.B.I. agents, suspecting defendant of involvement in a robbery, visited defendant's home at 7 p.m. When defendant arrived, the agents asked his parents to leave them in private, and, without informing him of any rights, including *Miranda* warnings, talked with him for two hours, obtaining incriminating statements. But, in addition to these factors, which are similar to those found in the case before us, and significant in the *Griffin* court's conclusion that there was "restrain[t] to a degree commonly associated with formal arrest," were the facts that on two occasions when defendant went out of the room to obtain cigarettes, he was accompanied by an agent, and that he was told to remain in view of the agents at all times. *Id.* at 1354. In other words, *Griffin* does not compel suppression in this case. There were no restraint-indicative orders with the directness of those in *Griffin*.

On the other hand, the government has cited *United States v. Hocking*, 860 F.2d 769 (7th Cir.1988). In that case two agents quizzed a suspect for three hours, asked his wife to leave, revealed that they possessed two tape recordings of conversations in which the suspect discussed payoffs, told him that he faced criminal charges, could be imprisoned, and that monies he received illegally could be forfeited. The court noted the politeness of the agents, the absence of threatening gestures, the "routine" nature of the questioning, and concluded that there had not been a custodial interrogation. *Id.* at 773. As we concluded concerning *Griffin*, so do we view *Hocking;* it does not compel a denial of the motion to suppress. In the instant case, the time span was longer, the handwriting exemplar exercise arguably more stressful, the lack of food an added factor.

What this comparison suggests to us is that the facts of this case place it in the gray area where a court, having the benefit of testimony and the "feel" of the situation, could decide that the interrogation was or was not custodial. We therefore hold that the district court did not commit clear error in drawing the inference that defendant was not in custody. *See Stanley*, 915 F.2d at 57.

We add one final note of caution. In argument before us, counsel for the government took the position that this was a clearcut case for denial of suppression. A decision to suppress on the ground that the interrogation had reached the custodial status would have been, he argued, clearly erroneous. Moreover, he argued that defendant "clearly controlled" the playing field and that the surroundings were "more relaxing for the suspect than the officers." Such hyperbole not only falls well short of helpful advocacy; it threatens one's hard-earned credibility.

*Affirmed.*