**UNITED STATES of America**

v.

**Ralph Arthur GOODRIDGE, and Willie Albert Brown, Defendants.**

**Criminal Action No. 96–30015 FHF.**

United States District Court,
D. Massachusetts.

Oct. 11, 1996.

---

·William J. O'Grady, Springfield, MA, for Ralph Goodridge.

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, for Willie Albert Brown.

William M. Welch, II, United States Attorney's Office, Springfield, MA, for the U.S.

FREEDMAN, Senior District Judge.

Report and recommendation is adopted.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT GOODRIDGE'S MOTION TO SUPPRESS STATEMENTS MADE BY THE DEFENDANT (Docket No. 26), MOTION TO SUPPRESS EVIDENCE ILLEGALLY SEIZED (Docket No. 27) and MOTION TO SUPPRESS EVIDENCE ILLEGALLY SEIZED (Docket No. 28)*

NEIMAN, United States Magistrate Judge.

## I. INTRODUCTION

An evidentiary hearing was held on August 2, 1996 with respect to Defendant Ralph

Arthur Goodridge ("Goodridge")'s motions to suppress any statements made by and all evidence seized from him on March 22, 1996, the date of his arrest. After the hearing, Goodridge and the Government submitted memoranda supporting their respective positions. Goodridge asserts in his memorandum that the statements and evidence seized were the result of a custodial interrogation, that he was entitled to be advised of his Miranda rights and that he was questioned without the benefit of being so informed. In response, the Government contends that Goodridge was never subject to a custodial interrogation, that his statements were voluntary and that any physical evidence was seized properly. Goodridge's motion has been referred to the Court for a report and recommendation pursuant to Rule 3 of the Rules of the United States Magistrates of the United States District Court for the District of Massachusetts. See 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court recommends that Goodridge's motions be allowed in part, but otherwise denied.

## II. FACTS

The facts as presented by the four Government witnesses, as described by Goodridge and with which the Government generally agrees, follow. Additional facts germane to the legal analysis are set forth in the discussion section below.

At approximately 3:30 p.m. on March 22, 1996, Goodridge was stopped outside his home at 24 Chester Lane in Waltham, Massachusetts, by Sergeant Michael Tobin ("Tobin") of the Massachusetts State Police, who was investigating a bank robbery in West Springfield earlier that day. He was briefly questioned about his whereabouts that day and asked to produce his license and registration. Goodridge complied and cooperated with Sergeant Tobin. Goodridge was then allowed to enter his home, although Sergeant Tobin, who had been joined by FBI Special Agent Judy Stilla ("Stilla") shortly after Goodridge was stopped, both kept watch on the house. According to Tobin, they could see

the front door and most of the backyard from Tobin's vehicle parked in front of the house. During this initial stop and questioning, Goodridge asked for but was denied permission by Stilla to get a coat out of his car.

Both Tobin and Stilla testified that Goodridge was wearing black sweat pants and black boots when he was first stopped. Both also indicated that a short time after Goodridge entered the house, he emerged walking a dog and wearing blue jeans and white sneakers. Goodridge then re-entered the house. A short time later, FBI Special Agents Todd Richards ("Richards") and Gerald Montonari ("Montonari") arrived and entered the home.[1] Montonari immediately sat down at the kitchen table with Goodridge and began to question him.

Montonari questioned Goodridge for approximately forty-five minutes, while Richards monitored the situation. At one point Richards "took" Goodridge's wife to an adjacent room and spoke with her there—although he kept his eye on Montonari and Goodridge "for the safety of the agents." There were at all times at least two and as many as four law enforcement officers in the kitchen with Goodridge during this time. Both Montonari and Richards testified that from the moment Montonari began to question Goodridge, Goodridge was not, in their opinion, free to leave. Montonari and Richards did not communicate this opinion to Goodridge. Similarly, Stilla, who observed the questioning at various points, testified that she did not feel that Goodridge was free to leave. At another point in her testimony, however, she indicated that she could not determine whether Goodridge was free to leave.

In response to the questioning by Montonari, Goodridge described his activities that day, a discussion which Montonari later summarized in writing. See Government's Exhibit A. On at least one and possibly two occasions, Goodridge indicated to Montonari that "I've got nothing more to say," stated that "I better talk to an attorney" and asked his wife to call an attorney. Each of those statements followed an exchange between

---

1. The exact manner in which the agents entered the house is unclear, although Goodridge does not assert that they entered without his permission.

Montonari and Goodridge in which Montonari accused Goodridge of lying. On each occasion when Goodridge mentioned an attorney, Montonari would pause and continue to ask questions, although on one occasion Montonari asked who his lawyer was, to which Goodridge replied, "Why should I tell you guys?" Richards testified that at least once he observed Goodridge's wife make a telephone call and presumed that call was made to an attorney.

Approximately one hour after Tobin initially stopped Goodridge and approximately forty-five minutes after Montonari began his questioning, a decision was communicated to Tobin by the U.S. Attorney's Office in Boston, and through Tobin to Montonari, to formally place Goodridge under arrest. Goodridge was so informed and was asked to step outside so that he would not have to be handcuffed in front of his children. Goodridge complied with the directions and stepped onto the front steps to be placed under arrest. At that point, Tobin asked Goodridge about the sweat pants and boots which he had worn into the house when he first entered. Specifically, Tobin asked Goodridge where the clothes were and requested Goodridge to ·take him there. Goodridge complied and took the agents to an upstairs bedroom. There, the agents also seized a knife and sheath on the bedroom bureau, asked Goodridge if they were his, to which he said "yes," and also seized and questioned Goodridge about a rifle scope which they found.

At no point throughout the time described above did any law enforcement official tell Goodridge that he had a right to consult with an attorney or that he had a right not to talk to law enforcement personnel. Even after they formally made a decision to place him under arrest, took him outside to arrest him and questioned him about the clothing, no law enforcement officer gave Goodridge Miranda warnings.

### III. DISCUSSION

There are at least three distinct time frames which bear scrutiny:

1. the initial stop of Goodridge by Tobin, and then Stilla, outside Goodridge's residence (first time frame);

2. the questioning of Goodridge by Montonari in Goodridge's kitchen for approximately forty-five minutes (second time frame); and

3. the further questioning of Goodridge by the police and the seizure of his black boots and black sweat pants after he had been formally placed under arrest but before being provided any Miranda warning (third time frame).

The Court will address these three time frames in turn and conclude with a discussion of Stilla's search of Goodridge's car.

### A. FIRST TIME FRAME

The only challenge which Goodridge mounts in his motion to suppress any statements he may have made during the first time frame is that the stop by Tobin and Stilla was impermissible under the standards of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He makes no viable claims with regard to the Fifth Amendment or *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Pursuant to *Terry,* an officer may make a brief investigatory stop of a person when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person[ ] with whom he is dealing may be armed and presently dangerous." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. The factors supporting a finding of reasonable suspicion must be viewed in light of the inferences and deductions that a trained and experienced officer would make, see *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), and may be based on the collective knowledge of several law enforcement personnel, see *United States v. Hensley,* 469 U.S. 221, 229–35, 105 S.Ct. 675, 680–84, 83 L.Ed.2d 604 (1985). In determining whether a stop is supported by reasonable suspicion, the totality of the circumstances must be taken into account. *Alabama v. White,* 496 U.S. 325, 330–32, 110 S.Ct. 2412, 2416–17, 110 L.Ed.2d 301 (1990); *United States v. Sokolow,* 490 U.S. 1, 8, 109

S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989); *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694–95. While the Supreme Court has made it clear that an objective justification must be more than an inchoate suspicion or hunch, "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585 (citations omitted). See also *United States v. McCarthy,* 77 F.3d 522, 529 (1st Cir.), *petition for cert. filed,* No. 96–5017 (May 22, 1996). ("The Fourth Amendment does not demand that probable cause exist prior to all police action"). As the First Circuit explained:

> In determining whether a challenged action is reasonable, and, thus, falls within the range of permissible investigatory stops or detentions, a court should engage in a two-step inquiry, asking (1) whether the officer's action was justified at its inception; and (2) whether the action taken was reasonably related in scope to the circumstances justifying the interference in the first place.... [I]n such circumstances, the question of reasonableness requires a court to balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. The inquiry is fact specific and a court should consider the totality of the circumstances confronting the police at the time of the stop.

*Id.* at 530 (citations and internal quotations omitted).

██ In the present matter, in light of the facts and the rational inferences therefrom, the Court finds that the stop and frisk of Goodridge was clearly justified at its inception. Tobin possessed sufficient information to warrant his reasonable suspicion. At the time of his initial contact with Goodridge at 3:30 p.m., Tobin knew that: (1) a bank had been robbed in West Springfield at approximately noon; (2) an eyewitness obtained the license plate and a specific description of a getaway car; (3) the getaway car's registration came back to an address in Cambridge associated with Goodridge; (4) Goodridge had a criminal history which included past bank robberies; (5) a car matching the de-

scription, by Tobin's own observation, drove up to Goodridge's home on Chester Lane in Waltham; and (6) the license number matched the license plate of the getaway car. Accordingly, based on an objectively reasonable standard, Tobin had enough reasonable suspicion to justify the initial stop of Goodridge. See also *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994) (temporal and geographic gaps of two hours and fifty miles between robbery and site of detention not enough to dispel reasonable suspicion based on exact match of unique automobile with driver fitting general description of bank robber).

██ Moreover, the initial stop never became so intrusive as to rise to the level of a seizure. Tobin identified himself initially when he approached Goodridge. Although Tobin patted down Goodridge, he never drew his weapon nor handcuffed him. Nor did Tobin confine Goodridge to a closed area, but instead conversed with him on a public street for only five minutes. Tobin advised Goodridge that he had information that his car had been involved in a bank robbery. In addition, Tobin told Goodridge that he did not have a search warrant for his car and advised Goodridge that he was not under arrest and that he was free to leave.

Stilla did not add to the intrusiveness of the stop—despite Goodridge's claim that the interview came "somewhat closer" to a custodial interrogation when she arrived. Stilla identified herself when she approached Goodridge, never drew her weapon or handcuffed him, and although she asked a few questions, Tobin remained the primary interviewer. The tone of the conversation between Tobin and Goodridge remained cordial and nonconfrontational, Stilla's presence did not lengthen the interview appreciably, and the interview continued in an open area.

██ Nonetheless, Goodridge argues that when Stilla denied him access to his car in order to retrieve a jacket, the stop became custodial—although Goodridge does not directly challenge the seizure of the jacket itself in this context. The Court disagrees. Since, as explained below, the jacket "seizure," if it can be called that, was permissible under *Terry,* it can hardly be argued that it

converted the stop into a custodial interrogation.

In essence, *Terry* allows for the seizure of personal property "on the basis of reasonable, articulable suspicion, premised on objective facts, that the [property] contains contraband or evidence of a crime." *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Here, the Government sets forth a litany of reasons why Stilla had such reasonable suspicion, only some of which need be mentioned to uphold the Government's contention. First, the jacket was located in a car that had been identified as the getaway vehicle in an armed bank robbery. Second, the jacket "seizure" took place only three and one-half hours after the crime and a two hour drive from the locus of the crime. Third, Goodridge had advised Tobin and Stilla that he possessed the car the entire day, including, apparently, the time period during which the armed bank robbery occurred. In sum, Stilla's action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879.

Further, the nature and extent of the jacket seizure was not so intrusive as to outweigh substantial governmental interests. As the Supreme Court has indicated, "[g]iven the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing Governmental interests would justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *Place,* 462 U.S. at 706, 103 S.Ct. at 2644. That standard has been met here. First, Stilla did not seize the jacket from Goodridge himself, but instead, simply detained Goodridge's access to it. Second, Stilla never took physical possession of the jacket, but instead allowed it to remain in Goodridge's car throughout the entire time frame; the jacket itself was not finally seized until the FBI executed a search warrant that evening. See discussion infra at III D. Third, the detention of the jacket was not burdensome to Goodridge in any respect and only lasted a short period of time. At bottom, the detention of the jacket did not violate any constitutional standard and, as a result, does not support the custodial nature of the stop.

Finally, Goodridge's own actions indicate that he could not have believed the stop by Tobin and Stilla to be custodial in nature. First, Goodridge understood enough to consent to a search of the interior of his car, but not its trunk. Second, Goodridge asked if he was under arrest—and was told no—and if he was free to leave—and was told yes. Third, Goodridge in fact left Tobin and Stilla, went into his residence without incident, changed his clothes and exited to walk his dog unimpeded over the course of the next fifteen minutes. In light of the facts and applicable law, therefore, any statements which Goodridge may have made to Tobin or Stilla during the Terry stop ought not be suppressed.

### B. *SECOND TIME FRAME*

Goodridge next argues that any oral statements he made during his interview with Montonari should be suppressed because he was not advised of his constitutional rights pursuant to *Miranda.* Goodridge asserts that, even though he was not under arrest at the time, the interview took place under coercive circumstances, it was really an interrogation and he was not provided any Miranda warnings until *after* incriminating statements were made. In response, the Government acknowledges that no Miranda warnings were given to Goodridge during the interview, but claims that Goodridge was not in custody when his statements were made.

■ Miranda warnings are not constitutionally mandated in all situations. *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182 (1974). Instead, the warnings are required as a safeguard against the possibility that the coercive circumstances of custodial interrogation might threaten the exercise of the Fifth Amendment privilege. *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630–31, 81 L.Ed.2d 550 (1984). The warnings are thus necessary only when a suspect is both in custody and subjected to interrogation. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. at 1629–

30; *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). A custodial situation occurs only when there is a formal arrest or a restraint on the freedom of movement of the degree associated with a formal arrest. *Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *United States v. Masse,* 816 F.2d 805, 809 (1st Cir.1987). As the Supreme Court explains,

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the Court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Thompson,* —— U.S. at ——, 116 S.Ct. at 465 (footnote and citation omitted). Whether a restraint of freedom triggers *Miranda,* therefore, must be determined by objective standards. *Podlaski v. Butterworth,* 677 F.2d 8, 9 (1st Cir.1982).

The question here, therefore, is not whether Goodridge felt restrained or coerced during the interview, but whether a reasonable person in his position would have so felt. *Stansbury v. California,* 511 U.S. 318, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (per curiam); see also *Masse,* 816 F.2d at 809 n. 5. Factors which may be considered in this analysis include, but are not limited to, (1) whether Goodridge was questioned in familiar or at least neutral surroundings, (2) how many law enforcement officers were present at the scene, (3) the degree of physical restraint placed upon him, and (4) the duration and character of the interrogation. See *Masse,* 816 F.2d at 809; *United States v. Streifel,* 781 F.2d 953, 961 n. 13 (1st Cir. 1986).[2] Here, having applied the applicable

standards to the second time frame, the Court cannot help but conclude both that Goodridge was subject to interrogation and that there was restraint on his freedom of movement of the degree associated with a formal arrest.

▮ Interrogation refers to both express questioning and its "functional equivalent," which includes "any words or actions on the part of the police (other than those normally attended to arrest and custody) that the police should know are reasonably likely to illicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted). The inquiry is an objective one: "how would the officer's statements and conduct be perceived by reasonable person in the same circumstances?" *Ventura,* 85 F.3d at 711 (citing *United States v. Taylor,* 985 F.2d 3, 7 (1st Cir.), *cert. denied,* 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993)). There is little question here that the interrogation was express and that the investigation was focused on Goodridge. While this focus is insufficient in itself to render the interrogation custodial and would not weigh heavily in the balance, it sets the stage for the consideration of those factors which have been identified and articulated by the First Circuit to measure the custodial nature of the questioning.

First, although Goodridge was questioned in familiar surroundings, a deprivation of freedom can as readily take place in one's home as at a police station. See *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Second, while there was no actual physical restraint placed on Goodridge, at least two officers were present at all times during the questioning, with as many as four officers outside his home—including Tobin and Stilla—who would enter into the residence at will. Moreover, while Montonari's questioning continued, Tobin was in contact with the United States Attorney's office—waiting for and finally receiving

---

2. These standards were recently reiterated and summarized by the First Circuit, which also indicated that "[d]etermining what constitutes custody can be a 'slippery' task." *United States v.*

*Ventura,* 85 F.3d 708, 711 (1st Cir.1996) (quoting *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985)).

authority to arrest. It was only then that Montonari's questioning of Goodridge ceased.

As for the third and fourth factors, according to the testimony of both Montonari and Richards, Goodridge was never free to leave when he was being questioned. Richards so testified, adding that he would have prevented Goodridge from leaving the apartment had he tried. Montonari testified that he too would not have let Goodridge leave. While the subjective beliefs of the interrogating officers are not particularly germane to the question before the Court, see *Ventura*, 85 F.3d at 711, citing *Stansbury*, 511 U.S. at ——, 114 S.Ct. at 1529, Stilla's testimony is. Stilla had been with the FBI for over five years, had been a member of the bank robbery task force for six months and had participated in twenty to fifty bank robbery investigations. Although she later retreated somewhat from her position, since she was not the controlling officer at the time, Stilla testified that, from her point of view, Goodridge was not free to leave during the interrogation. This testimony adds objectivity to the inquiry and helps explain why Goodridge himself could have reasonably believed that the interrogation was custodial in nature.

As the Supreme Court explained in *Orozco*, 394 U.S. at 327, 89 S.Ct. at 1097, where, according to the officer's testimony, the defendant was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning, Miranda warnings are required when the person being interrogated is "in custody at the station or otherwise deprived of his freedom of action in any significant way." While there can only be speculation as to the specific action the FBI would have taken if Goodridge had attempted to leave, it is clear that his freedom of action was sufficiently circumscribed to conclude that he was in a custodial environment.

Indeed, the instant matter presents more compelling facts than *United States v. McVeigh*, 940 F.Supp. 1541, 1555 (D.Colo. 1996). In *McVeigh*, those in command of the investigation had instructed that the defendant be placed under close surveillance were he to leave the police station where he had voluntarily appeared. Although the extent of control was not known to the defendant, the court held these circumstances to be custodial. The only reason the court refused to suppress the defendant's statements was because a valid Miranda warning had been given him *before* any substantive questioning took place. Here, in contrast, not only was Goodridge in a custodial setting—i.e., the FBI arrived at Goodridge's door involuntarily, he was no doubt aware of the number of police officers who were present and the FBI would have prevented him from leaving, rather than simply placing him under surveillance—no Miranda warning was ever given to him.

Nonetheless, to demonstrate the outer reaches to which an interrogation might go without being custodial, the Government, in its supporting memorandum, spends much time citing and relying on the facts in *United States v. Lanni*, 951 F.2d 440, 441 (1st Cir. 1991). In *Lanni*, the trial court refused to suppress statements made to two federal agents who interviewed the defendant at her home in the early morning hours. As here, there were no Miranda warning given at the time and "there was no other statement suggesting either that defendant was free to terminate the conversation at any time or that she was not free." *Id.* at 441–42. The interview lasted approximately four hours, the agents did not permit the defendant's husband or father to attend the interview, the defendant did not eat and, during the last portion of the interview, the interviewing agent told the defendant that her explanation did not make sense, whereupon defendant began to cry and ultimately provide a statement. After balancing the facts evidencing freedom of movement with those suggesting restraint, the First Circuit found that the case fell into "the gray area where a court, having the benefit of testimony and the 'feel' of the situation, could decide that the interrogation was or was not custodial." *Id.* at 443.

The present matter, no less than *Lanni*, also falls into this gray area. However, unlike *Lanni*, the "feel" in the instant case—given all the facts described above—is that Goodridge was questioned in a custodial setting. It would have been unreasonable for Goodridge to believe otherwise. Indeed, at

least twice during the interview, even without the benefit of a Miranda warning, he limited his answers and made mention of his need for a lawyer—efforts which his wife evidently undertook without success. As described, Goodridge stated on two occasions that he had "nothing more to say" and "I better talk to an attorney."

In fact, the Government draws a distinction, for purposes of the Court's analysis, between what Goodridge may have said before and what he may have said after he first stated that he "better talk to an attorney." Thus, Richards testified that "roughly all" of the information later provided in Montonari's written report was obtained before this statement—although he could not otherwise be specific. Montonari testified, however, that his written report did not reflect the order of the interview. Goodridge, for his part, asserts that the situation became "even more" custodial when Montonari began to accuse him of lying—to which Goodridge replied with his statement about the need for an attorney. In this regard, Goodridge also claims that he invoked his right to be silent.

It is beyond peradventure that a suspect who has expressed his desire to deal with police only through counsel is not subject to further interrogation by authorities unless counsel has been made available to him or the accused himself initiates further communications, exchanges or conversations with the police. See *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). Resumption of questioning is illegal if an assertion of Miranda rights is not "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). *Miranda*, of course, does not require a suspect to adopt any particular wording to manifest his wishes. Although he "need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, ——, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (citation and internal quotation omitted). See also *United States v. Prestigiacomo*, 504 F.Supp. 681, 683 (E.D.N.Y.1981) (where defendant said "maybe it would be good to get a lawyer," he sufficiently requested counsel); *Maglio v. Jago*, 580 F.2d 202, 205 (6th Cir. 1978) (defendant's statement of "maybe I should have an attorney" was proper assertion of right to counsel.)

Interestingly enough, the cases cited by the parties all arose out of questioning which *followed* the provision of a Miranda warning. Here, in contrast, no Miranda warning was given to Goodridge as, in this Court's opinion, it should have been. Rather than treating Goodridge's references as at least an equivocal request for counsel or silence, calling for some inquiry on Montonari's part to clarify the statements, see *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir.1979), Montonari essentially ignored the statements and continued his interrogation. However, unless Goodridge is arguing that he fully understood that Miranda rights were applicable, that he understood those rights and they need not have even been communicated to him by the FBI, the Court cannot presume for purposes here that he understood those rights at the time they ought to have been provided. The Court, therefore, need not make a determination as to whether Goodridge's Miranda rights were invoked when they were not even given, or whether they were waived when the agents themselves thought them unnecessary, or whether Goodridge clearly articulated his request for counsel. Rather, in the Court's view, Goodridge's statements and Montonari's response—including his accusing Goodridge of lying—simply add flavor to the custodial character of the interrogation from its inception.

In sum, while the interrogation may have been relatively brief, its character was such—taken together with the other factors considered above—as to demonstrate its custodial nature. Moreover, the subsequent arrest necessarily colors what went before. It is difficult, if not impossible, to say that Goodridge was unreasonable in believing himself in custody when, as it turned out, his belief was correct. See *United States v. Bekowies*, 432 F.2d 8, 14 (9th Cir.1970). Accordingly, any statements made by Goo-

dridge during this time without the benefit of a Miranda warning ought to be suppressed.

## C. THIRD TIME FRAME

Goodridge next asserts that the situation was "per se" custodial when Tobin told him he would be arrested and, in fact, formally arrested him on the front steps. Goodridge argues that, no Miranda warning still having been given or waived at this time, questioning him with respect to any physical evidence, and the ensuing seizure, was improper. In response, the Government concedes that no Miranda warnings were given at the time of the arrest, but argues that the physical evidence should not be suppressed because the police did not interrogate Goodridge when they asked for and received his consent to search. Given the particular complicating circumstances here—the absence of a Miranda warning and the potentially testimonial nature of the consent—it is instructive to first review case law with regard to consensual searches.

A consensual search is one of the established and well-delineated exceptions to both the warrant and probable cause requirements. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 1261–62, 90 L.Ed. 1453 (1946)). See also *United States v. Patrone*, 948 F.2d 813, 815–16 (1st Cir.1991), *cert. denied*, 504 U.S. 978, 112 S.Ct. 2953, 119 L.Ed.2d 575 (1992). The Government bears the burden of proving that such consent was voluntary. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48; see also *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *United States v. Zapata*, 18 F.3d 971, 977–78 (1st Cir.1994). A consent is not voluntary if it is coerced by threats of force or granted only in submission to a claim of lawful authority. *Schneckloth*, 412 U.S. at 233, 93

S.Ct. at 2050–51. However, it is not necessary for the police to inform the subject of the search of his right to refuse. *Id.* at 231–32, 93 S.Ct. at 2049–50. "Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." *Id.* at 233, 93 S.Ct. at 2050.

■ The First Circuit has said the following with respect to the determination of a voluntary consent to search:

Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence and knowledge of the right to withhold consent. More general considerations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.

*United States v. Barnett*, 989 F.2d 546, 555 (1st Cir.), *cert. denied*, 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). As implied, therefore, and as other courts have held, the failure to give Miranda warnings does not inevitably mean that a later consent is tainted by that failure. See, e.g., *U.S. v. Cherry*, 759 F.2d 1196 (5th Cir.1985). Moreover, despite the inherent compulsion of custodial surroundings, consent to a search may be obtained from a person in custody, especially when that custody is "on-the-street." As the Supreme Court explained, "[i]n these circumstances, to hold that illegal coercion is made out from the fact of arrest and the failure to inform the arrestee that he could withhold consent would not be consistent with *Schneckloth* and would distort the voluntariness standard that we reaffirmed in that case." *United States v. Watson*, 423 U.S. 411, 425, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976)

■ Finally, "a consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation." *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993), *cert. denied*, 510 U.S. 1061, 114 S.Ct. 733, 126 L.Ed.2d 696

(1994). This view comports with the view apparently taken by every court of appeals to have addressed the issue. See e.g., *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.) ("Simply put, a consent to search is not an incriminating statement. [The suspect]'s consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial.") (citations omitted), *cert. denied,* 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *Smith v. Wainwright,* 581 F.2d 1149, 1152 (5th Cir.1978) ("A consent to search is not a self-incriminating statement; '[i]t is not in itself evidence of testimonial or communicative nature.'") (quoting *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977)).

■ Here, had the police simply requested Goodridge to consent to a search, the above cited cases would end Goodridge's challenge—for the totality of circumstances certainly indicate that he intended to consent. But his consent was more limited than described in the Government's supporting brief. Thus, Tobin's inquiry was not so much a broad request to search as it was a specific request that Goodridge provide the boots and sweat pants he had previously been wearing. That inquiry, in turn, resulted in Goodridge's leading the police upstairs and finding the articles himself. At that time, the police also found a knife and rifle scope and questioned Goodridge about them. Accordingly, although Tobin was initially looking for specific physical evidence, not a testimonial response from Goodridge, Goodridge's response—both leading the police to the articles and answering questions about two additional articles— may well be considered testimonial and therefore incriminating.

In this regard, the First Circuit's decision in *United States v. Downing,* 665 F.2d 404 (1st Cir.1981) is instructive. In *Downing,* a federal customs officer, who had failed to provide a Miranda warning or ascertain that the defendant had previously asserted his right to counsel to a state police officer, asked the defendant during the booking process what his keys belonged to. When the defendant indicated that the keys were to an airplane and, after further questioning, that the airplane was at a specific airport, the police obtained a warrant, searched the airplane and found evidence of the defendant's complicity in a drug conspiracy. The defendant's statements were obviously testimonial. As a result, the First Circuit was inclined to uphold the suppression of the evidence, but remanded the case to determine whether the evidence would have been discovered independent of the defendant's statements to the police. *Id.,* at 409.

In contrast, Goodridge's actions, at least with regard to the boots and sweat pants, were not testimonial. Unlike the airplane in *Downing,* the police were aware of the boots and sweat pants, having closely observed Goodridge wearing those articles before entering the house and thereafter exiting for a brief period in a new outfit. Moreover, the police were not attempting to exploit the absence of Miranda warnings. As the Supreme Court instructs, it must be determined "whether, granting establishment of the primary illegality, the evidence to which instant objection is made, has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Here, the evidence was not the fruit of the prior illegality, i.e., the absence of a Miranda warning after Goodridge's arrest, and Tobin did not intend to gather testimonial answers. Rather, the inquiry of Goodridge was in essence a request to consent to a search for the particular known items and, as such, was allowable with respect to the boots and sweat pants.

At bottom, the facts are such as to convince this Court that Goodridge's consent to search for the boots and sweat pants was voluntary and non-exploitative of any prior illegality. As is evident from the facts, Goodridge's will was not overborne, he was cognizant enough of his right to refuse consent, as shown by his prior refusal to consent to a search of the car trunk, see *United States v. Manuel,* 992 F.2d 272 (10th Cir.1993), and his consent was not improperly obtained.

In this vein, the Government's citation of *United States v. Shlater,* 85 F.3d 1251 (7th

Cir.1996), is germane. After having been read his rights, Shlater told the police that he wanted to talk to his lawyer before answering any more questions. Although the police stopped interrogating Shlater, they were given permission to search his home, whereupon incriminating evidence was found. Shlater never objected to the police's presence or to the search. On appeal, however, Shlater argued that the district court erred in denying his motion to suppress because "the police obtained his consent to search after he had affirmatively requested an attorney pursuant to his Fifth Amendment rights under *Miranda*." *Id.* at 1255. Shlater contended "that the police request to search was reasonably likely to elicit an incriminating response because the police believed incriminating evidence could be found at Shlater's home." *Id.* at 1256.

In rejecting defendant's argument, the Seventh Circuit observed that "*Miranda* only applies to the 'custodial interrogation' of a defendant." *Id.* at 1256. The court reasoned that "a consent to search is not an interrogation within the meaning of *Miranda*." *Id.* (citing *United States v. Saadeh*, 61 F.3d 510, 515 (7th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995)). Therefore, the court held, "the consent to search was not a custodial interrogation triggering the previously invoked *Miranda* right to counsel" since, in essence, "the law provides that a request for counsel during the interrogation does not apply to the subsequent request for a consent to search." *Id.* (citing cases).

■ The *Shlater* analysis is certainly appropriate to the facts of this case. Although Sergeant Tobin did not read Goodridge his Miranda rights at the time of his arrest, his failure to do so did not invalidate Goodridge's consent to search his residence for the boots and sweat pants. The seizure of that physical evidence ought not be suppressed. Nonetheless, it is this Court's opinion that the knife and rifle scope, and any statements Goodridge may have made during the third time frame, should be suppressed. The search, to the extent it discovered the knife and rifle scope, went beyond the consent given and the questions with respect to these

items were clearly exploitative of the prior failure to provide Miranda warnings. The Government has not argued that these items would have been discovered independent of the *Miranda* violation.

### D. SEARCH OF CAR

■ During her search of Goodridge's car, Stilla seized a number of items that were not covered by the authorizing search warrant. However, as became apparent at the hearing, all of those items were in plain view during the execution of the search warrant and their seizure was supported by probable cause.

The First Circuit recently articulated the proper standards for determining whether the "plain view" exception to the warrant requirement applies:

> To satisfy the "plain view" exception to the warrant requirement, the government must show that (1) the law enforcement agent was legally in a position to observe the seized evidence, and (2) the incriminating nature of the evidence was "immediately apparent" to the officer. See *United States v. Giannetta*, 909 F.2d 571, 578 (1st Cir.1990). The incriminating nature of the evidence is "immediately apparent" if the officer, upon observing the evidence, has probable cause to believe the item is contraband or evidence of a crime. *Id.* "A practical nontechnical probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quotations omitted).

*McCarthy*, 77 F.3d at 534. Moreover, "[l]aw enforcement agents may seize evidence in plain view during a lawful search even though the items seized are not included within the scope of the warrant." *United States v. Robles*, 45 F.3d 1, 6 (1st Cir.) (citing cases), *cert. denied*, — U.S. —, 115 S.Ct. 1416, 131 L.Ed.2d 300 (1995).

Although Goodridge does not address the seizure of the evidence in his memorandum, the above standards have been met. First, while executing a valid search warrant, Stilla was clearly in a position to observe the seized evidence. Second, the incriminating nature

of the unnamed items was immediately apparent to her. Indeed, given the fact that the car had been identified as the getaway car, anything found in the car could reasonably be considered incriminating. In particular, this is true of the photos, the police scanner book and the tools, the incriminating nature of which is self-evident, as well as of the mallet (information having been obtained that one of the robbers had smashed a window) and batteries (which could be used for a police scanner). Accordingly, Goodridge's motion to suppress all items seized should be denied.

### CONCLUSION

For the reasons stated, the Court recommends that Goodridge's motion to suppress statements (Docket No. 26) be ALLOWED with regard to (1) any statements he may have made to Montonari and (2) any statements he may have made at his home after his formal arrest, but otherwise DENIED. Defendant's Motions to Suppress Evidence Illegally Seized (Docket No. 27 and 28) should be ALLOWED with respect to the knife and rifle scope seized from his home, but otherwise DENIED.[3]

Date: September 17, 1996.

---

3. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); and *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.